| | |
|---|---|
| Yates Real Estate, Inc.; Yates House for Military Veterans, Inc.; and John and Jane Doe,<br><br>Plaintiffs,<br><br>v.<br><br>Plainfield Zoning Board of Adjustment; City of Plainfield,<br><br>Defendants. | Civ. No. 18-12700-KM-CLW<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on a motion for a preliminary injunction (DE 8) brought by the plaintiffs, Yates Real Estate, Inc. ("Yates RE"), and Yates House for Military Veterans, Inc. ("Yates House"). (I will distinguish between the plaintiffs as necessary, but otherwise refer to them collectively as "Yates.") Defendants Plainfield Zoning Board of Adjustment ("Zoning Board") and the City of Plainfield ("City") oppose the plaintiffs' application. (DE 14).

In 2017, Yates filed an application with the Zoning Board for thirty-eight variances and thirty-three waivers to permit him to develop a 25-unit apartment complex in the City's Van Wyck Brooks Historic District. To do so, Yates required use, density, height, and bulk variances, as well as design waivers. Yates purchased the property in 2012, knowing that the property was in the historic district and was zoned for residential use.

Between October 4, 2017 and June 6, 2018, the Zoning Board held six days of hearings on Yates's application. It was midway through the hearing that Yates first agreed to deed-restrict the property to military veterans. Yates proffered that homeless veterans frequently suffer from Post-Traumatic Stress Disorder ("PTSD"), but never agreed to confine residency to veterans with PTSD. Yates argued, however, that because the building was likely to service

1

some PTSD sufferers, several federal civil rights statutes mandated that Yates's application be granted as a reasonable accommodation.

By way of resolution dated August 1, 2018, the Zoning Board denied the application. It found that the requested variances would violate not only historic-preservation provisions as such, but also basic regulations (*e.g.,* minimum square footage of units, storage space, parking) that would apply generally to any apartment building.

On August 13, 2018, Yates filed this action against the Zoning Board and City, alleging that the denial of its application violated (1) the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("FHAA"); (2) the Americans with Disabilities Act ("ADA"); (3) the Rehabilitation Act; and (4) the New Jersey Municipal Land Use Law ("MLUL"). For current purposes, the analysis would be similar under any of the three federal statutes.

Now before the Court is the plaintiffs' motion for a preliminary injunction. Yates requests that this Court effectively grant its zoning application so that permits can be issued and renovations can begin at the subject property. (DE 8). For the reasons stated in this Opinion, the motion for a preliminary injunction is denied.

### I.    Background[1]

---

[1]    Certain key items from the record are abbreviated as follows:

"DE __" = Docket Entry number in this case;

"Compl" = Plaintiffs' Complaint (DE 1);

"PBr" = Plaintiffs' moving brief (DE 8);

"DBr" = Defendants' opposition (DE 14);

"Reply" = Plaintiffs' reply brief (DE 17);

1T = October 4, 2017 Transcript of Hearing (DE 23-1);

2T = November 1, 2017 Transcript of Hearing (DE 23-2);

3T = December 6, 2017 Transcript of Hearing (DE 23-3);

4T = April 11, 2018 Transcript of Hearing (DE 23-4);

5T = May 2, 2018 Transcript of Hearing (DE 23-5);

6T = June 6, 2018 Transcript of Hearing (DE 23-6).

## A. Yates's Application before the Zoning Board

Yates RE is a developer which seeks to develop a piece of property located at 808-814 Central Avenue in the City of Plainfield. (Compl, Ex. I, ¶1 (City of Plainfield, Zoning Board of Adjustment, Resolution of Findings and Conclusions, dated August 1, 2018 (hereinafter "Resolution"))). Tax records state that Yates RE purchased the property on July 24, 2012 for $100,000, although Yates RE also submitted evidence that it purchased the property for $300,000. (Resolution ¶4; DE 24-26, at 7). Yates RE has agreed to lease the property to Yates House, a 501(c)(3) nonprofit entity, for the sum of $1.00 per year. (Resolution ¶60; Compl ¶10).

The property lot is 30,089 square feet, and the proposed building would contain 14,065 square feet. (DE 24-5). It contains a vacant three-story dwelling with a two-story addition. (Resolution ¶2). The property is located within the City's Van Wyck Brooks Historic District. Apartment buildings are not a permitted use within that district. (Resolution ¶3). In 1981, the City designated this area as a historic district, and it was placed on the New Jersey Register of Historic Places in 1985. (Resolution Conclusions at 49, ¶11).[2] The zoning was downsized to permit two units per acre in order to protect the historic nature of the area. (Resolution ¶228). The zone permits one- or two-family residential uses, as well as bed-and-breakfast inns. (DE 1-2, at 57)[3].

In 2017, Yates filed an application with the Zoning Board for a series of variances so that the property could be renovated into an apartment building. (Resolution ¶¶5, 15; 1T3:4-8). Yates wants to build a three-story addition to the rear of the vacant three-story building, and to convert the building to twenty-five apartments. (Id.).

---

[2]   https://plainfieldnj.gov/cms.aspx?page_id=62&page_name=Historic%20Districts. The official map of the Van Wyck Brooks Historic District may be found at https://plainfieldnj.gov/downloads/planning/historical/vanwyck%205-29-03-002.pdf. See also Zoning map, https://www.plainfieldnj.gov/docs2015/2015-Zoning-Map-06-2015.pdf; Detail of City tax map (DE 24-10).

[3]   This page number refers to the automatically generated ECF number located at the top right corner of the document.

3

Yates's application included a request for thirty-eight variances and thirty-three waivers. (1T32:17-20). The requested variances in Yates's application before the Board included the following: (1) use variance under N.J. Stat. Ann. §40:55D-70(d)(1) to allow for the construction of an apartment building in the zone; (2) density variance under N.J. Stat. Ann. §40:55D-70(d)(5) to allow for 36.2 units per acre, instead of two; (3) height variance under N.J. Stat. Ann. § 40:55D-70(d) from the statutory maximum of thirty-five feet to forty-one feet; (4) bulk variances under N.J. Stat. Ann. §40:55D-70(c) relating to maximum building and lot coverage; and (5) a series of variances to maintain the current nonconforming conditions related to the lot area, width, frontage, and side-yard setback. (Resolution ¶¶5-8).

Yates also sought a series of supplemental zone variances and design waivers. (Resolution ¶9(A)-(W)). The most contested aspect of this part of the application concerned the size of the proposed units. Studio apartments are required to be a minimum 500 square feet; twenty-one or twenty-two of the 25 proposed units, however, are less than 500 square feet. The smallest unit is 256 square feet. (Resolution ¶9(M); 3T101:5-9, 105:2-5; 4T:18:7-17; DE 24-5; DE 24-18).[4]

Additionally, part of this application sought relief from the Residential Site Improvement Standards ("RSIS"), which requires 1.8 parking spaces per one-bedroom apartment. (Id.; 4T55:24-25). Forty-five parking spaces would be required for a twenty-five-unit apartment, but only eleven spaces were

---

[4]     William Doran, RA, the architect of the proposed property, testified on two separate occasions before the Board, on December 6, 2017 and on April 11, 2018. During his first day of testimony, he indicated that twenty-one of the rooms were below the 500 square feet requirement for a studio. (3T101:5-9, 105:2-5; Resolution ¶107). On the second day of his testimony, he submitted a chart that provided the specific square footages of each unit in the building. (4T18:14-17; DE 24-18). Of the twenty-five units listed in that chart, twenty-two units were below 500 square feet. (Resolution ¶107). The Resolution of the Board notes this discrepancy. (Resolution ¶107). However, in a separate paragraph of the Resolution, the Board inaccurately states that "none of the proposed twenty-five (25) apartment units contains the minimum required square footage." (Resolution ¶9(M)). It appears that three or four of the twenty-five would meet the minimum requirement of 500 square feet.

proposed. (Resolution ¶9(K); 4T53:24-4, 56:13-17). Finally, although RSIS requires each unit to have 350 cubic feet of associated storage space, none of the proposed units offer any storage space. (Resolution ¶9(Q); 3T110:20-111:4).

### B. Hearings before the Zoning Board

The Board held hearings on Yates's application on six dates: October 4, 2017; November 1, 2017; December 6, 2017; April 11, 2018; May 2, 2018; and June 6, 2018. (*See* Resolution). Yates presented the testimony of Yates's principal, Andre Yates; David Cathcart, a clinician[5] specializing in the treatment of PTSD; Emerson Crooks, a veteran; David Pearson, the Assistant Director of Catholic Charities and Support Services for Veteran Families; Pastor Seth Kaper-Dale, the developer and operator of a homeless veteran facility in Highland Park, New Jersey; Anthony Flax, the CEO of Yates House; Dr. Sean R. Evers, Ph.D.; William Doran, RA, the architect of the proposed property; Daniel Doran, P.E.; Rhonda Coe, an affordable housing expert; and John Leoncavallo, a professional planner. (Resolution ¶¶12, 15, 59-70, 82-123, 129, 140, 153, 181). William Michelson, the Chairman of the Historic Preservation Commission ("HPC"), and several members of the public also testified. (Resolution ¶¶224-30).

Mr. Yates indicated that the purpose of the property was "to create permanent housing for military veterans in Union County." (1T15:22-16:1). In a subsequent hearing date, he reconfirmed that the criteria for placement in the facility would be that the individual is a veteran. (2T50:19-23). Flax testified that "the general profile" of the tenants would be male and female veterans in their twenties to middle-aged, some of whom would be coming to the facility directly from the service, shelters, or temporary housing. (2T10:16-21).

The restriction of occupancy to veterans, or homeless veterans, or veterans with PTSD, was an evolving and somewhat elusive concept. At one point, the attorney for Yates indicated that Yates was *considering* limiting the occupancy of the project to veterans, but that Yates "was not yet willing to

---

[5]     Mr. Cathcart possesses a master's degree in psychology. (1T20:17-20).

*agree* to such a limitation." (Resolution ¶78; 2T85:16-86:11 (emphasis added)). In response to a concern raised by a member of the public, Mr. Vignuolo, a board member, engaged in the following exchange with Yates's attorney:

> MR. VIGNUOLO: Mr. Rother, if I may, would the applicant be amenable to a condition of any approval that the use is limited to housing for veterans, as opposed to –
>
> MR. ROTHER: We have actually discussed that, and I would like to reserve a comment on that. But we have discussed that already, that's something we have under discussion.
>
> MR. VIGNUOLO: I just figured, at this time, it was a concern raised by a resident, and certainly that restriction would . . . resolve that concern, and any subsequent use of the property for the general public, as opposed to veterans, would then require an additional use variance before this board.
>
> MR. ROTHER: We've discussed it; we haven't come to a conclusion yet. We certainly will respond to that request.

(2T85:16-86:11). On the third day of hearings before the Board, the Board followed up on this issue:

> CHAIRMAN BELIN: . . . But my question was, the application, is it narrowing the type of resident that may stay in this home, thus making the home more or less like a group home or a veteran's home? It's not an open, free-will type apartment situation anymore, is it?
>
> MR. ROTHER: No, we're – we're looking to house homeless veterans, who typically have PTSD, that's the focus. . . .
>
> VICE CHAIR RUIZ: So if you have a homeless veteran, which I'm assuming there are going to be others that don't have PTSD, they're not going to be able to live here, according to your arguments?
>
> MR. ROTHER: They typically do, and that's – we're going to take homeless vets, but they – . . .
>
> MR. ROTHER: If you look at the statistics, there are plenty of homeless veterans. We're going to be able to fill this facility very easily.

(3T7:24-9:5; 9:9-10:6).

The attorney for Yates suggested that the tenants would be suffering from PTSD because there is a "connection" between homelessness and PTSD, and the prospective tenants would be coming from temporary shelters. However, he would not definitely say that the prospective tenants (or what percentage of them) would have PTSD. (2T70:15-71:9).[6] Mr. Rother acknowledged that not all homeless veterans suffer from PTSD. (3T73:23-74:3).

On yet another hearing date, Yates declined to confirm that the residency of the project would be restricted to homeless veterans, or, more pointedly, to homeless veterans with PTSD. (Resolution ¶83). Eventually, during one of the later hearing dates, Yates agreed to deed-restrict the property to housing for veterans. (Resolution ¶165; 4T107:3-6).

1.    *Subject Property*

Yates represented that it purchased the property for $300,000. This representation contradicted the County's records, which showed that the declared purchase price was $100,000. (DE 8-24; 24-26, at 5). Mr. Yates indicated that he knew that the property was zoned as a historic district when he bought it, and that the area was essentially zoned for residential, private homes. (2T112:20-24).

---

[6]    The lack of clarity regarding the prospective tenants, and whether the prospective tenants would, in fact, fall within a protected class, was aptly expressed by Chairman Belin:

> CHAIRMAN BELIN: Okay. So here's the thing. Last month's testimony gave the impression that the veterans that would be living in this permanent facility . . . would be just folks who served as veterans, and as such, have had a challenge in finding either work or a place to live, and they would be able to fit right into the community with -- seamlessly, actually. They may require some . . . support, in the sense of going to the VA, or maybe going to some appointments, but now I'm hearing testimony this month that every veteran who is going to be a part of this particular endeavor may fall under a protected group, and that's what I'm hearing.

(2T71:13-72:7).

A property manager would be available on site twenty-four hours per day, seven days per week. (Resolution ¶64; 2T12:20-21). There would be three other employees at the property: the CEO of the facility, a secretary, and a chef. (Resolution ¶¶64, 144; 2T12:23-13:6). Four service providers were also anticipated to be present at the property at various times during the day. (Resolution ¶144; 4T53:7-13).

The property would have a commercial kitchen, a multipurpose room, and a dining area in the common areas. (Resolution ¶¶12-13; 1T17:1-23). The property would be a "home first model," which would prioritize stabilizing the veterans' housing. (Resolution ¶14; 1T18:8-11). The facility, as a secondary aim, would also offer support services, such as case management, transportation, church services, and yoga. (Resolution ¶14; 1T18:12-18, 19:13-23).[7] Mr. Yates indicated that the residents would all be capable of handing the needs of daily living independently. (2T110:21-111:2).

Each unit was a "studio" apartment and was designed for either single or double occupancy. (Resolution ¶71; 2T46:25-47:6). The anticipated occupancy of the project was thirty-six individuals within twenty-four units, plus a manager in the remaining unit. (Resolution ¶71; 2T67:10-19).

Each unit would have a kitchenette, bathroom, closet, and living space. (Resolution ¶12; 1T16:21-23). The proposed renovations sought to add 563

---

[7]    When asked about what type of services the property would provide, Flax provided an answer that suggested that the tenants might, or might not, have PTSD:

> Q. And are there any additional services that you can address?
>
> A. We have -- we have, also, money management skills, to help them get back on their feet, how to balance their checkbook, things that they -- you would think that, ordinarily, everybody would know, but, again, remember, these were our -- our superheroes, our Justice League individuals who went to far away lands to fight for us, facing incredible situations and circumstances, that led themselves to come back different, affected: maybe service injured, service-connected injured; maybe injury with the mental, or dealing with what we all know is PTSD, or in some cases MST, for our female veterans that's military sexual trauma, for the acronym.

(2T13:9-23).

square feet of space to the first floor; 726 square feet to the second floor; and 2,333 square feet to the third floor. (Resolution ¶101; 3T93:7-18). Doran, RA (the architect) expressed his opinion that there was no structural issue in adding a third floor but acknowledged that he had not confirmed that opinion with a structural engineer. (Resolution ¶116; 3T129:15-18).

The Board also inquired as to the tenants' ability to store groceries. (Resolution ¶68; 2T21:20-23:8). Absent a variance, each unit would be required to provide 350 cubic feet of storage space, aside from ordinary closet space. (Resolution ¶106). Flax testified that the tenants would be aware of the limited storage space, would be limited by economics, and, presumably, would not be able to afford much. (Resolution ¶68; 2T22:4-23:8). Flax postulated that the commercial kitchen might have space for the tenants' groceries. (*Id.*).

Yates's smallest proposed unit is 256 square feet, while the largest is 595 square feet. (Resolution ¶102; 3T92:6-13). The minimum square footage allowed under the land use ordinance is 500 square feet for a studio apartment. (Resolution ¶106; 3T101:5-9). Notably, Coe, Yates's affordable housing expert, testified that the State Housing and Mortgage Finance Agency requires about 525-550 square feet for a studio apartment in an affordable-housing unit. (Resolution ¶160; 4T86:16-87:11).[8] Of the twenty-five units,

_____

[8]     Coe indicated that the State and HUD programs have different guidelines that govern the minimum square footage requirements of a unit that will be covered by a subsidy. She indicated, nonetheless, that the requirements for a studio are about the same, 500 square feet, under all affordable housing programs. (4T87:7-88:4). The attorney for Yates, who was not a sworn witness, indicated that there was not a square footage requirement under HUD-VASH, the federal program that assists homeless veterans and their families afford housing through the use of housing vouchers. (4T88:5-6). Coe testified that the developer, Mr. Yates, who was not qualified as an expert in affordable housing, told her that there was no requirement as well. (4T88:16-17).

According to the HUD, a proposed unit that receives a HUD-VASH voucher must meet Housing Quality Standards ("HQS") established by HUD. Dep't of Hous. and Urban Dev. and Veterans Affairs Supportive Hous., "HUD-VASH Resource Guide for Permanent Housing and Clinical Care," at 37 (June 2004), *available at* https://files.hudexchange.info/resources/documents/HUD-VASH%20Resource%20Guide.pdf; *see* Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-VA Supportive Housing Program, 77 Fed. Reg. 57 (Mar.

twenty-one or twenty-two were below the square footage requirement. (Resolution ¶107, 122; DE 24-5). The average floor area per unit was 373.64 square feet. (Resolution ¶122).[9]

Doran, RA (the architect) indicated that the sizes of the units were dictated by the instructions he received from Yates. His instructions were to supply a specific number of units, without respect to the requirements of the land use ordinance. (Resolution ¶¶108, 110; 3T108:16-20). Doran further indicated that in his thirty years of experience, he had never been asked to create units with such small square footages. (Resolution ¶111; 3T117:3-8). He stated that if minimum square footage requirements were honored, only thirteen (not the proposed twenty-five) conforming units could be created. (Resolution ¶113; 4T20:2-23).

The Board asked several witnesses about the sizes of the units, and why Yates, who was planning to build an addition, could not use the extra space created by the addition to expand the room sizes. In response, Mr. Yates expressed that nursing home rooms are required to be 80 square feet and that other veterans lived in rooms that were 80 square feet. (2T34:14-14, 36:1-13). He further indicated that the proposed units were an "upgrade" and that he was hoping to "maximize" the space for the greatest number of veterans.

---

23, 2012), *available at* https://www.govinfo.gov/content/pkg/FR-2012-03-23/pdf/2012-7081.pdf; *see also* 24 C.F.R. § 982.401 (listing thirteen HQS). Yates did not produce any testimony as to whether the units meet the HQS listed in 24 C.F.R. § 982.401.

9    Yates disputed that the property was an "apartment building," implying that the property should not be subjected to compliance with the City's standards for apartment buildings and units. (Resolution ¶138-139, 190). However, the application submitted by Yates to the Board was for a multi-unit apartment building. (4T26:22-25, 45:15-21). As a result, the Board did not consider the application as anything but an application for an apartment building. (*See* Resolution).

Additionally, prior to fourth day of hearings, which was when this argument was suggested (4T26:8-25,44:9-45:12), all the witnesses presented by Yates, including Doran RA and Mr. Yates, referred to the building as an apartment complex. Leoncavallo, the planner, ultimately conceded that the application was for apartments. (5T66:6-22).

(2T35:21-36:13, 53:13-24, 54:11-55:1). When asked about the proposed size of the units, Flax replied that Yates was limited by the existing building, and that the Board was required to make a reasonable accommodation. (Resolution ¶69; 2T30:15-23).

Regarding parking, the evidence was that an asphalt driveway would provide a total of eleven parking spots, consisting of nine standard spots and two ADA/handicapped spaces. (Resolution ¶¶142-44; 4T52:24-53:7). The RSIS requires forty-five spaces. (Resolution ¶145; 4T55:24-56:17).

Yates's position on parking changed over the course of the hearings. First, Flax assured the Board that, based on "the economic profile of the veterans," the tenants would not be able to afford vehicles. (Resolution ¶63, 144; 2T25:1-12; 6T62:19-7). Indeed, he said, the residents would not need vehicles in this urban area. (Resolution ¶79; 2T105:1-16). Doran P.E. suggested to the Board that the tenants would be prohibited from having vehicles, presumably as a condition of the lease. (4T54:4-5, 55:12-16). Finally, Flax and Leoncavallo suggested that any tenant who did have a vehicle would be required to arrange for parking at a facility several blocks away from the property. (Resolution ¶63, 144; 2T25:1-12; 5T98:5-13; 6T62:19-7). The tenants would also be permitted to have guests, potentially increasing the occupancy on a temporary basis and adding to the traffic and parking congestion at the property. (Resolution ¶¶80, 215; 2T108:1-7).[10]

Several members of the public testified as to existing parking problems in the vicinity of the property and their potential exacerbation if the project were approved. (Resolution ¶¶225, 227). Michaelson testified that the property was located on a short block, that there were never fewer than six cars parked on the street during the daytime, and that as many as twenty-seven were parked there during the evening. (6T28:11-14). He opined that the street could not accommodate any more vehicles. (6T28:13-14).

---

[10] When asked whether the manager would have a vehicle, Mr. Yates indicated he would supply that information to the Board, but he never did so. (Resolution ¶76).

The public also raised concerns with the ability of emergency personnel to traverse Central Avenue if parking became any more crowded. (Resolution ¶227; 6T42:5-11). Members of the public also expressed doubt as to Yates's ability to restrict the prospective tenants' ownership of vehicles. (Resolution ¶227; 6T42:12-17).

Despite the concerns raised by HPC and the public, Yates did not submit a traffic or parking study. Nor was a traffic or parking engineer called as a witness to address this issue. (Resolution Conclusions at 51, ¶12).

### 2. Financial Feasibility

Mr. Yates proffered that the proposed tenants would be relying on subsidies to pay rent. (Resolution ¶70; 2T43:24-44:9). Upon prompting from his counsel, Mr. Yates, suggested that the subsidized rents would be insufficient to permit Yates to offer studio apartments that met the minimum square footage requirement. (Id.). If the units were required to meet the square footage requirements, the number of units would be reduced from twenty-five to thirteen. (Resolution ¶113; 4T20:2-23). If so, then the subsidized rents would not cover the mortgage debt for the cost of the proposed improvements. (Resolution ¶74).

Yates called Coe, an affordable housing expert, to address the financial feasibility of the project. She testified that Yates would need permanent financing and grant dollars to develop the project, and HUD-VASH vouchers to operate the project. (Resolution ¶157; 4T76:9-14).[11] The operating dollars from

---

[11]     "The HUD-VASH Program combines the Department of Housing and Urban Development (HUD) Housing Choice Voucher (HCV) rental assistance for homeless veterans and their families with case management and clinical services provided by the Department of Veterans Affairs (VA) at its medical centers and in the community." Beneficiaries of the vouchers are selected based on certain criteria, including health care eligibility, homelessness status, and income. Since 2008, beneficiaries are no longer required to be chronically mentally ill or have chronic substance abuse disorders. However, chronically homeless veterans are a target population for HUD-VASH. See U.S. Dep't of Hous. And Urban Dev., HUD-VASH Eligibility Requirements, https://www.hudexchange.info/programs/hud-vash/hud-vash-eligibility-requirements/.

the HUD-VASH subsidies, she said, would be used to pay debt service. (Resolution ¶157; 4T76:17-18).

During Coe's testimony, Yates submitted a fifteen-year operation *pro forma* document, purporting to demonstrate the financial viability of the project. (DE 8-24). The figures therein included "department costs, construction costs and what it proposes in terms of operating subsidies." (4T72:22-24). The source of those figures, said Coe, was Yates. (Resolution ¶¶161, 168; 4T72:22-24, 90:12-15). Mr. Yates was asked to disclose the underlying basis for those construction, operating, and financing costs. He declined to do so. (Resolution ¶¶166-168; DE 8-24; 4T111:9).

Yates told Coe that the total development cost was $3.2 million, of which $2.1 million was for construction costs. (4T73:10-12). Coe testified that Yates anticipated receiving HUD-VASH vouchers of $988 per unit, which would generate approximately $284,000 per year. (4T73:17-19). The HUD-VASH rent subsidies for the twenty-four units would cover $1.5 million of the $3.2 million development costs, and Yates would be required to secure grants in order to cover the difference of $1.7 million. (Resolution ¶159; 4T74:9-18).[12]

Coe also indicated that Yates proposed to set aside $2,500 yearly for its "replacement" reserves. (4T89:22-15). A Board member expressed concern that such an amount would be insufficient to maintain this historic building, and Coe agreed. (4T90:6-11;[13] 6T64:13).

---

[12]    During the public comment period of the hearings, a resident testified that HUD released a press release on April 6, 2018, wherein it indicated that 62 HUD-VASH vouchers would be available to New Jersey residents, for a total of $568,362. (6T37:6-38:11).

[13]    The exchange was as follows:

MS. BURGWINKLE: . . . Because this is an old house and it's a historic house and it's been empty for a very long time and they don't improve with age unless they're constantly being, like, swaddled in cash, candidly. So is that enough?

THE WITNESS: I agree. So what I indicated at the outset was that the numbers that I used in the pro forma are numbers that I received from the developer. And I would also say that the numbers that are used any pro forma, regardless of what kind of affordable housing you do, are

3.    *Analysis by Historic Preservation Commission*

The HPC reviews applications within historic districts to determine whether renovations or improvements to a property are consistent with standards within the district. (Resolution ¶¶129-30). The HPC also reviews requests for variances within such districts. (Resolution ¶130). If the proposed renovations meet the HPC's standards, it will issue a certificate of appropriateness. (*Id.*).

The HPC reviewed the variances requested by Yates. (Resolution ¶132). HPC did not object to grandfathering the nonconforming uses that were already in existence prior to Yates's application—namely, the height and bulk variances. (Resolution ¶132). However, HPC objected to the new use and density variances, and recommended that the Board reject Yates's application. (Resolution ¶¶133-34; 4T29:4-32:18, 32:16-18).

In particular, Michelson objected to the request to increase the number of units per acre. (Resolution ¶133; 4T31:2-7). He further stressed that the large number of people residing at the facility, plus staff, visitors, and other activities, was not consistent with the ambiance of the historic district or the core values of the City's Master Plan. (Resolution ¶134; 4T31:20-32:8, 132:11-15).[14]

Mr. Yates provided a preliminary cost estimate for the rehabilitation of over $1 million. He acknowledged that the location of the property within the historic district increased the renovation costs. (*Id.*; 2T58:24-59:4). The Board asked why, then, Mr. Yates chose to pursue this project in the historic district, when he could have chosen to build his project in a zone that permits

---

projections. So what you generally do is you tweak them the closer you get to securing all of your dollars to make sure that you're honing in on all those costs. So this is just a preliminary pro forma.

(4T90:6-23).

[14]    The current zoning ordinance and the City's Master Plan were adopted approximately twenty years previously. (Resolution ¶135). There was no allegation of so-called "spot zoning" or post hoc adjustment of standards in response to Yates's proposal.

apartments and did not require the additional expenditures associated with renovating a historic building. (Resolution ¶75). Mr. Yates replied that he enjoyed undertaking historical renovations and opined that other buildings in the area were non-conforming. (Id.; 2T114:3-115:13). The Board rejected his lay opinion regarding the non-conforming buildings. (Id.).

### 4. Need & Beneficial Use

Yates provided evidence regarding the need for this type of proposed property, as well as its potential beneficial use.

The Board considered other locations available for this type of property within the City. There are ten zones within the City that permit apartment buildings. (Resolution ¶219). Within a couple of blocks of the subject property, there are higher density zones that permit apartment buildings. (2T60:25-61:1). Additionally, the nearby town of Lyons in Somerset County has veterans' housing available. (Resolution ¶25).

Yates presented the testimony of Pastor Seth Kaper-Dale. He testified about the development of eleven "garden apartments," called All Saints Apartments, for low-income, homeless veterans in Highland Park, New Jersey. (Resolution ¶44; 1T105:8-106:9, 109:10; DE 25-2 (Highland Park Board of Adjustment, Resolution of Findings and Conclusions, dated June 22, 2009) (hereinafter "Highland Park Resolution") ¶12). The "funding stream" that the Pastor received for the apartments required that the property be used to serve veterans. (1T135:18-20). All the residents of the apartments were "referred . . . by the Veterans Administration ('VA') Homeless Services Unit." (Highland Park Resolution ¶7).

The zoning application submitted to the Highland Park Board of Adjustment for approval of the All Saints Apartments requested a density variance, a conditional use variance, and preliminary and final site plan approval "to modify an existing church and construct eleven (11) very low income residential units along with office space" in a "residential, multi-family/garden apartment zone." (Highland Park Resolution). The Highland Park

Board approved the zoning application for All Saints Apartments. (Highland Park Resolution).

The All Saints facility, which opened in 2011, was in an area zoned for apartments, and did not require a variance for the size of the units. (Resolution ¶¶47, 52; 1T106:10, 112:22-23, 115:16-19, 126:10-14; Highland Park Resolution).[15] The studio units were all over 500 square feet and complied with state standards for affordable housing units. (Resolution ¶189; 1T126:3-4; Highland Park Resolution ¶15). Each unit has its own kitchen and bathroom. (Resolution ¶47; 1T111:17-21).

When All Saints Apartments initially opened, none of the residents had vehicles; now, however, seven of the eleven residents have vehicles. (Resolution ¶48; 1T118:16-21). On-street parking demand in that area was "low" and parking was "readily available." (Highland Park Resolution ¶11). The vehicles are parked on a public road. (*Id.*).[16]

Yates also presented information concerning a City-owned property, the Dudley House, which is a transitional rooming facility for homeless veterans. (Resolution ¶124; 4T21:1-23:18). Dudley House is not an apartment complex. It was formerly used as a rehabilitation facility for persons recovering from alcoholism. (4T24:20-25:2, 27:1-3). The square footage of the units in the Dudley House is less than the minimum otherwise required by the land use ordinance. (Resolution ¶125; 4T22:21:15-22:15). Unlike apartment units, the

---

[15] A planner testified before the Highland Park Board that a nearby garden apartment, and other neighborhood apartment complexes, had "a density similar to the proposed density" of the application. (Highland Park Resolution ¶15). The Highland Park Board determined that the proposed use was "consistent with the Zoning Ordinance and the Master Plan . . . especially since there is already multifamily use in the immediate area." (Highland Park Resolution at 10, ¶2).

[16] The Board apparently pointed out this fact to Mr. Yates—*i.e.,* that all the tenants of the All Saints Apartment arrived without vehicles, but that seven residents now have cars. (Resolution ¶67). Mr. Yates responded that Pastor Kaper-Dale had testified that the residents of that facility received their vehicles from donations and that the facility solicited those donations. (Resolution ¶67). The Board's review of the record revealed that the Pastor did not so testify. (*Id.*). At any rate, Flax indicated that Yates would not solicit such donations. (*Id.*).

rooms at the Dudley House do not have individual bathrooms or kitchens. (4T25:17-26:3).[17]

A member of the public, Arne Aakre, testified regarding a veterans housing project in Basking Ridge, New Jersey. (Resolution ¶229; 6T46:21-48:15). The sizes of the units in the Basking Ridge housing project met or exceeded the City's square footage requirements for the apartment units. (Resolution ¶229; 6T46:21-47:3).

Crooks testified as to his experience as a veteran and stated a need for permanent housing for veterans. (Resolution ¶¶27-31). Pearson echoed that there was a need in all New Jersey counties for the type of facility proposed by Yates. (Resolution ¶38). Leoncavallo indicated that Union County (where Plainfield is located) particularly needs a veterans' apartment building. (Resolution ¶206). Aside from these generalizations, however, Yates did not present testimony regarding the number of homeless veterans in Union County.

Cathcart, Crooks, and Dr. Evers testified as to the benefits of veterans residing together in a communal setting. (Resolution ¶¶15-19, 28, 92; 1T24:17-25:7, 56:12-57:11, 58:19-59:15; 3T28:15-29:6). Cathcart likened the communal living experience to a form of group therapy. (Resolution ¶¶15-19; 1T25:4-5).

Dr. Evers, an expert in clinical psychology focusing on PTSD in the military, testified that veterans are disproportionately represented in the homeless population. (Resolution ¶¶82, 85; 3T55:4-10). Approximately eleven percent of homeless individuals are veterans and two-thirds of homeless Iraq and Afghanistan veterans suffer from PTSD. (Resolution ¶91; 3T26:22-25, 27:4-14). He noted that PTSD was a spectrum disorder, affecting individuals in

---

[17]     Dudley House, located at 930 Putnam Avenue, is not within the Van Wyck Brooks Historic District. *See* DE 24-6. That address does seem to be within the adjoining Putnam-Watchung Historic District, however.
https://www.plainfieldnj.gov/downloads/planning/historical/putnam%205-29-03-001.pdf

varying degrees, and that there is a connection between PTSD and homelessness. (Resolution ¶¶89-90; 3T39:16-18, 41:17-23, 42:15-22).

Leoncavallo opined that the proposed use was "inherently beneficial," and that it advanced several of the goals outlined in New Jersey's Municipal Land Use Law, see N.J. Stat. Ann. §40:55D-2, and in the City's Master Plan. (Resolution ¶¶199-202). However, he did not provide much specificity regarding the manner in which the proposed project advanced those statutorily enumerated goals. (Resolution Conclusions at 52, ¶17; 5T69:20-94:12).

He further opined that the property was ripe for adaptive re-use because of its dilapidated condition. (Resolution ¶204; 5T84:4-8, 92:4-7).[18] Leoncavallo admitted that granting these multiple variances might cause some detriment, including an increase in foot traffic. (Resolution ¶210, 212).

### 5. Apartments in the Historic District

Yates presented evidence of other similar properties in the district that did not conform to current zoning requirements.

First, Yates submitted an aerial view of the subject property, as well as four nearby "apartment complexes." (Resolution ¶181; DE 8-20).[19] These four neighboring properties were developed prior to the current zoning plan, at a time when apartments were permitted in the area. (5T14:21-23).

---

[18] Yates took the position during the hearing that it would be beneficial to improve the subject property, which was apparently dilapidated and in need of such improvements. However, Yates had not taken any steps to improve the property from the time it had acquired the property in 2012 until the time of the application before the Zoning Board, a period of about five years. (Resolution ¶¶220-22, 230; 6T50:20-51:17). Mr. Yates appeared before the HPC twice to get approval to repair the roof and porch, which was granted. (6T27:14-21). Neither of these improvements was made, however. (Id.).

[19] The four complexes are the following: The Williamsburg, located at 735 Central Avenue with 12 units; Executive Arms, located at 315 West 8th Street with 27 units; Jade Manor, located at 821 Central Avenue with 33 apartments; and Central Avenue Apartments, located at 831 Central Avenue with 20 apartment units. (DE 8-20; 5T53:9-56:15).

18

Yates also submitted a second aerial view of the subject property and eight surrounding "apartment conversions." (Resolution ¶181; DE 8-21).[20] Yates's attorney and Leoncavallo suggested that the appearance of meters on the outside of the buildings and cables, or possibly telephone lines, suggested that the buildings were being operated as multi-unit apartments. (*See* 5T15:5-17, 31:11-34:10; DE 8-20, 8-21; Resolution ¶193-94).[21]

Yates did not confirm that the cables connected to the homes represented actual working telephone lines. Yates also did not obtain information from the building department or tax assessor's office regarding the number of units in the neighboring buildings. (Resolution ¶195).[22] None of the properties were on the same block as the subject property. (Resolution ¶182).

---

[20]   The eight properties in this aerial depiction are located at 440 W. 8th Street; 424 W. 8th Street; 416 W. 8th Street; 321 W. 8th Street; 305 W. 8th Street; 823 Madison Avenue; 822 Madison Avenue; and 832 Madison Avenue. (DE 8-21).

[21]   Leoncavallo testified that the eight properties had the following number of units based on certain outdoor physical attributes:

440 W. 8th Street: 6 or 8 units (7 cables);

424 W. 8th Street: 4 units (4 electric meters);

416 W. 8th Street: 6 units (6 electric meters);

321 W. 8th Street: 6 units (per conversation with tenant);

305 W. 8th Street: 6 units (6 electric meters);

823 Madison Avenue: 4 units (4 electric meters);

822 Madison Avenue: 4 or 5 units (11 cables); and

832 Madison Avenue: 3 units (3 electric meters).

(DE 24-23; 5T35:21-38:2). Even accepting these facts as indicative of the number of units, the proposed Yates facility would have a density per acre approximately nine times that of the surrounding properties. (5T58:16-59:8).

During one of hearings, a member of the public advised that in the area of the City in which he resides, there are five single-family dwellings, each of which has four meters because it was previously used as a multifamily dwelling, but that the legacy meters are left in place, apparently to avoid the cost of removal. (Resolution ¶224; 5T151:1-19). One of the Board members commented that he lived in a single-family home which had multiple cables connected. (5T15:10-19). Such evidence is concededly anecdotal; the Resolution does not appear to rely on it.

[22]   Leoncavallo, Yates's professional planner, testified that he did not have enough time to obtain this information, even though Yates's application was filed on August 7,

The City's Planning Director and Board Planner, William Nierstedt, advised that any multifamily uses, to the extent that they existed in the aerial depictions presented by Yates, either (a) were illegal nonconforming uses or (b) predated the code, *i.e.*, were built before the area was zoned as it is today. (Resolution ¶106, 183; 5T16:9-16, 18:19-17).[23] In terms of the apartment "conversions," Nierstedt indicated that he could not recall that any of the identified properties had received a multi-family use variance. (Resolution ¶184).

Nierstedt further testified that he could recall two other properties within the district that had filed applications with the Board: one property had applied for an interpretation, and a second had applied to convert a structure into a bed and breakfast (Resolution ¶185; DE 1-2, at 61; 5T87:9-10).

The owner of the subject property, before it was purchased by Yates, had applied to the Board to permit its use as a nursing home, which had closed in 2009. (*Id.*) On July 13, 2005, the City had approved the nursing home zoning application on behalf of another developer, CPR Holdings, Inc. ("CPR"). (DE 24-16). At the property, CPR operated a thirty-five-bed skilled nursing facility, known as the Abbott Manor Convalescent Center. (*Id.*). CPR's 2005 application sought to expand the property to sixty beds. (*Id.*). The City granted that application as a reasonable accommodation to permit the handicapped residents to continue to reside in that facility. (*Id.* at 39).[24]

---

2017, and Leoncavallo did not testify until the May 2, 2018 hearing. (Resolution ¶195). The Board rejected this excuse. (*Id.*).

[23] Yates's attorney asked Michelson about the apartment complex across the street from the Yates property. (Resolution ¶135; 4T33:4-8). Michelson testified that the apartment building was constructed at a time when the ordinances permitted it. (4T33:10-13). Additionally, that complex charges its residents for parking. (*Id.*). As a result, the residents of that building park on the street and contribute to the area's parking issues. (*Id.*).

[24] The attorney for Yates suggested to the Board that the previous approval in 2005 for the property as a nursing facility was a "more intensive use." (Resolution ¶138).

6.       *Comments during the Hearing*

Yates points to a series of comments that were made during the hearing by Board members. These comments, it says, evince a bias against veterans with PTSD.

The biased comments, says Yates, arose in in the context of testimony regarding the benefits of veterans living in a group setting. (*See, e.g.,* Resolution ¶¶15-19, 28, 92). When Dr. Evers was asked about the benefits of veterans living together, he responded as follows:

> A. Different than other psychological conditions, the veteran population comes in with an in-group/out-group thought process. The in group is veterans. Veterans feel more comfortable with other veterans. When I first started treating people with PTSD, and veterans with PTSD, the first thing I had to overcome was the fact that I only served in the National Guard, and the National Guard, in the 1970s, was not quite exactly the military. It was kind of like the Boy Scouts with real guns, but they never let us have bullets, because when you have bullets, you do bad stuff. That took a while to get in with the population, because I was coming in as an outsider. . . .
>
> CHAIRMAN BELIN: And because you were not a combat veteran, they had a – a reticence toward interacting with you?
>
> MR. EVERS: Well, I -- what you have to do is win the trust. As a veteran, if I were a veteran provider, I would probably not have to go over that first hurdle, that hurdle of winning the trust. Once you go over that hurdle and you become okay, you're trusted, then it's a little bit easier.

(3T28:17-30:2).

Yates also points to the following exchange, which it says suggests bias on the part of a Board member:

> COMMISSIONER JORDAN: All right. So then a second question is, if there's a trust issue with the vets trusting people that are not vets, what would be the -would there be an issue with them living in a community where it's just regular neighbors?
>
> MR. EVERS: When we're talking about the trust issue, there's two things -- and I'll go back to that. One is the trust in treatment,

which is part of what I was referring to, I'm asking someone to tell me their deepest, darkest secrets --

COMMISSIONER JORDAN: So it's more the one-on-one type thing?

MR. EVERS: One-on-one, and even group, because I was the nonveteran in the group. When we think of people in society, that was the goal, to have everybody – that's where they came from, they grew up in the society, then, the society decided to send them someplace, and ended up giving them PTSD, and our goal is to kind of bring them back to functioning in that society. The idea of other veterans just facilitates that goal.

(DE 8-6, at 65-66; PBr at 12).

Dr. Evers discussed the treatment of veterans and noted in particular that, compared to Vietnam veterans, recent veterans tend to seek treatment much sooner. (DE 8-6, at 47). In that context, Yates points to the following exchange as an example of the Board's alleged bias:

MR. EVERS: Actually, for the Iraq veteran, who was not ostracized as the Vietnam veteran was, it is better. These guys are coming a little bit earlier, they're not waiting until they've been out failing for 10 years before they come for treatment, they're coming sooner. It's kind of like that missile that launches, you know, if you catch it right after the launch, it's only one degree off; if you wait 30 years, you kind of miss the planet you're aiming at. By catching the veterans younger, stabilizing them quicker, we actually bring them back on course faster.

CHAIRMAN BELIN: Okay. See, were here trying to understand the use. Right? And whether or not the use of this particular residence is the best land use at this time. The added condition of it being a focused group begs the question, are there any concerns that we as a board should have of having a group in an isolated — a voluntarily isolated environment, where the trust is only amongst their small group until some later period in time? Is there any concern to the community?

MR. EVERS: Okay. I can speak from my experience, being in the same -- my office is within three miles for the last 35 years. I don't see that there has - been a concern in the community. I see veterans that are not homeless and veterans that are homeless; people that we've been able to help get housing in all sorts of different ways, since we don't have that much housing down by

where I live anyway. It's not -- would I be concerned if a veteran with PTSD moved in as my neighbor? No.

CHAIRMAN BELIN: Okay. Do you think that that veteran would trust you?

MR. EVERS: I think, after he realized I wasn't blowing the leaves on his lawn on purpose, and we had a cup of coffee, we probably would be okay.

(DE 8-6, at 46-48; PBr at 12).

## C. The Board's Denial of Yates's Application

At the conclusion of the hearing, the Board voted unanimously to deny Yates's application. (6T58:79:10). The Board memorialized this decision in a resolution that was adopted on August 1, 2018. (DE 1-2).

In denying Yates's application, the Board considered the obligations imposed by federal civil rights statutes. (Resolution ¶¶2-10). First, the Board concluded that Yates had failed to establish the required nexus between the requested accommodation and an established necessity for providing handicapped individuals with an equal opportunity to use and enjoy housing. (Resolution Conclusions at 45, ¶3 (citing *Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 459 (3d Cir. 2002))). PTSD is considered a disability, and an individual with PTSD is considered part of the protected class under the federal statutes. However, the Board noted that while Yates agreed to deed restrict the property to veterans, it did not agree to limit housing to homeless veterans or, more pertinently, to homeless veterans with PTSD. (Resolution ¶4).

In addressing the need for such a facility, the Board noted that there are ten zones within the City that allow apartment buildings as a permitted use. (Resolution ¶¶5, 22). Moreover, the evidence established that there are numerous residential zones within the City that allow for the density proposed by Yates. (Resolution ¶5). The Board also noted that even if there were apartments within the vicinity of the subject property, there was no evidence that the prospective tenants were unable to secure housing in those buildings. (*Id.*).

23

The Board concluded that Yates failed to establish that the significantly undersized apartments, and by extension the creation of 25 units, were necessary for the financial viability of the project. (Resolution ¶¶6-7). It observed that the units in the All Saints Apartments and the veterans' housing project in Basking Ridge met or exceeded the minimum square footage requirements of the applicable land use ordinances. (Resolution ¶7).

Additionally, the Board concluded that Yates's requested financial accommodation was not justified by the record. (Resolution ¶8). Coe's testimony was based on the information that was supplied to her by Yates. (Id.). When asked to provide the underlying basis for the projected costs of the project, Yates failed to do so. (Id.). The Board noted that tax records reflected that Yates acquired the property for $100,000, whereas Yates represented to Coe (and the Board) that it had purchased the property for $300,000, suggesting that the numbers provided to Coe were inaccurate or inflated. (Id.). The Board noted that the square footage requirement protects prospective tenants from substandard living conditions. (Resolution ¶10).[25] In sum, the Board determined that Yates had failed to establish its need for a financial accommodation. (Resolution ¶8).

The Board determined that the large number of accommodations sought would fundamentally alter the nature of the City's zoning program. (Resolution ¶¶9-10). The subject property would undermine the purpose, objectives, and

---

[25]     During the Board's vote, one of the Board members expressed doubt as to whether the recipients of the federal HUD-VASH vouchers, which could be used in any type of facility or apartment complex, would instead choose to live in substandard units:

> The proposed positive would be for housing for veterans, and it would be presumably affordable housing, but I think that's mitigated by the fact that there's already plenty of affordable housing in Plainfield that veterans can live in with vouchers. And I question the financial voucher to the veterans if they're paying an amount for proposed units that would get them much larger apartments elsewhere in town. They can probably get better housing for the amount that they're going to pay for that voucher.

(6T59:3-14).

policies of the historic preservation elements of the City's Master Plan, which recognizes historic preservation as a tool for economic growth and community revitalization, and sets forth goals and strategies for historic preservation. (Resolution ¶11). In this regard, the Board adopted the HPC's determination that the requested variances were inimical to the historic plan preservation element of the Master Plan. (Resolution ¶11).

The Board stressed that the parking issues in the vicinity of the subject property would likely be exacerbated by the addition of a 25-unit apartment complex, and that Yates would likely be unable to enforce a parking restriction on its residents. (Resolution ¶12; 4T56:24-57:24). Yates did not present a traffic study to dispute this conclusion. (Resolution ¶18). Moreover, Yates's proposed parking restriction failed to consider the impact on parking caused by service providers or visitors to the property. (Resolution ¶12).

The Board addressed Yates's application under the MLUL. (Resolution ¶13). The Board noted that Yates failed to present any precedent that demonstrated that the proposed project has been recognized as inherently beneficial. (Resolution ¶14). The Board determined that the request for a significant addition, while still failing to provide the minimum unit size, and inability to supply the required number on-site parking spaces, suggested that the site is not suitable for the proposed use. (Resolution ¶16).

Turning to the issue of nonconforming properties in the area, the Board found that Yates did not present evidence that these properties had obtained the necessary zoning approvals to be used as multifamily properties. (Resolution ¶19). The Board noted that the examples given were illegal, nonconforming properties and that it is required to evaluate each application on its own merits. (Resolution ¶16). Moreover, the Board expressed concern of a potential "domino effect" if it accepted Yates's argument – *i.e.,* that the grant of Yates's application could be used by other property owners in support of the construction of other high-density residential housing in the historic district, resulting in a breakdown of the zone. (*Id.*).

The Board concluded that the number of variances required could not be granted without creating a substantial detriment to the City's zoning plan and frustrating the goal of the land use ordinance to confine and restore the zone to single and two-family uses. (Resolution ¶¶19-29).

In evaluating the public good, the Board considered the impact on neighboring properties, in particular the possibility of exacerbating the parking issues on the street, the impact on light, air, and open space, and the increase in the number of residents in the area. (Resolution ¶21).

The Board denied Yates's application on August 1, 2018.

### D. Procedural History

After the Board denied Yates's application, on August 13, 2018, Yates filed a verified complaint in this Court, alleging violations of the FHAA; ADA; the Rehabilitation Act; and MLUL. (DE 1). The first three counts of the complaint allege that the defendants were entitled to a reasonable accommodation in the form of issuance of the proposed variances. (Compl ¶¶23-38). The last count alleges that the Board's denial of Yates's application was arbitrary, capricious, and unreasonable in violation of the MLUL. (Compl ¶40). The complaint seeks a declaratory judgment that the actions of the Board and the City violate the FHAA, ADA, Rehabilitation Act, and MLUL, and requests an injunction directing the issuance of the land use approvals and building permits. (Compl ¶40).

On October 2, 2018, plaintiffs filed their motion for a preliminary injunction, which requests that this Court effectively grant its zoning application so that permits can be issued, and renovations can begin on the subject property. (DE 8). The plaintiffs' submission to this Court, however, included only a portion of the record.

On November 9, 2018, defendants filed their opposition to plaintiffs' motion and on November 20, 2018, plaintiffs filed their reply. (DE 14).

On May 10, 2019, this Court terminated the motion, and ordered the plaintiff to submit the entirety of the administrative record. (DE 22). The

plaintiffs did so on May 15 and May 16, 2019. (DE 24, 25). The motion was then restored to the calendar.

## II.    Standards

### A. Preliminary injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. "While each factor need not be established beyond doubt, they must combine to show the immediate necessity of injunctive relief." *Cmty. Servs. v. Heidelberg Twp.*, 439 F. Supp. 2d 380, 395 (M.D. Pa. 2006).

The decision to grant or deny a preliminary injunction is within the Court's discretion. *See Am. Express Travel Related Servs., Inc. v. Sidamon—Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). Moreover, the primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645,

647 (3d Cir. 1994). Particular scrutiny is required where, as here, the plaintiff is asking the Court to order an affirmative act rather than a stay to maintain the status quo. *See Bennington Foods LLC v. St. Croix Renaissance, Group LLP*, 528 F.3d 176, 179 (3d Cir. 2008) ("where the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction."); *Acierno*, 40 F.3d at 653 ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.").

### B. Review of Zoning Board decision

Regarding the proper scope of review, the Third Circuit has held that "courts hearing reasonable accommodations challenges should ordinarily limit their review to the administrative record." *Lapid-Laurel*, 284 F.3d at 451. Importantly, "[t]his rule permits local land use boards to have the initial opportunity to provide reasonable accommodations to facilitate housing for the handicapped; it also comports with the tradition in American law that land use decisions are quintessentially local in nature." *Id.* (citing *FERC v. Mississippi*, 456 U.S. 742, 768 n.30, 102 S. Ct. 2126 (1982) ("Regulation of land use is perhaps the quintessential state activity."); *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 13, 94 S. Ct. 1536 (1974) (Marshall, J., dissenting) (noting that zoning "may indeed be the most essential function performed by local government")).

Limiting the federal court's review in this manner "compels plaintiffs to 'present all of the evidence they have that would justify why an accommodation is necessary . . . to the local land-use board." *Barnabei v. Chadds Ford Twp.*, 125 F. Supp. 3d 515, 519-20 (E.D. Pa. 2015) (quoting *Lapid-Laurel*, 284 F.3d at 451). Moreover, "if plaintiffs fail to do so, they will be prohibited from introducing evidence in support of their FHA claims in federal court." *Id.* This framework further ensures that municipalities are not held liable for refusing to grant an accommodation where "those municipalities 'never knew the

accommodation[s] w[ere], in fact, necessary." *Id.* (citing *Keys Youth Services, Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001)).[26]

### III.   Framework under the FHAA, ADA, and Rehabilitation Act

Yates's preliminary injunction briefing focuses on the federal civil rights statutes. (PBr at 14-23). Yates and Yates House have not argued that a preliminary injunction is warranted pursuant to the New Jersey MLUL.[27] Accordingly, this Opinion is confined to those federal civil rights claims.[28] The

---

[26]   Plaintiffs have submitted documents to this Court that they did not present to the Board. I will disregard these documents. They are not properly before the Court, and plaintiffs have not contended that they were denied a full and fair opportunity to present their case to the Board. *See Lapid-Laurel*, 284 F.3d at 450-54.

[27]   The MLUL, N.J. Stat. Ann. §§ 40:55D-1 to -136, is a comprehensive statute that allows municipalities to adopt ordinances to regulate land development "in a manner which will promote the public health, safety, morals and general welfare" using uniform and efficient procedures. *Levin v. Twp. of Parsippany-Troy Hills*, 82 N.J. 174, 178-79 (1980). Under the MLUL, the decision of a board of adjustment is presumptively valid, and may be reversed only if it is unsupported by the record, arbitrary, capricious, or unreasonable such that it amounts to an abuse of discretion. *Kratz v. Zoning Bd. of Adjustment of City of Hoboken*, 2007 N.J. Super. Unpub. LEXIS 1110, at *15 (App. Div. July 25, 2007) (citation omitted); *see Rowatti v. Gonchar*, 101 N.J. 46, 51–52 (1985) (recognizing that arbitrary and capricious standard of review parallels substantial evidence standard when applied to zoning board's decision.).

A Zoning Board's factual findings are entitled to substantial deference and are presumed to be valid. *Price v. Strategic Capital Partners, LLC*, 404 N.J. Super. 295, 302 (App. Div. 2008) (citing *Burbridge v. Mine Hill Twp.*, 117 N.J. 376, 385 (1990) (quotation and citation omitted); *Kramer v. Bd. of Adjustment, Sea Girt*, 45 N.J. 268, 296 (1965)). "The test is essentially one of rational basis." *Worthington v. Fauver*, 88 N.J. 183, 204–05 (1982). "Arbitrary and capricious action . . . means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is (valid) when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." *Id.* (internal quotations and citation omitted).

[28]   Typically, "arguments raised in passing . . . but not squarely argued, are considered waived." *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (citing *Commonwealth of Pa. v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996)); *see also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("a passing reference to an issue ... will not suffice to bring that issue before this court."); *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 334 n.5 (D.N.J. 2000) (finding "casual reference" to a claim results in waiver). "When an issue is not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal." *Travitz v. Ne. Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 711 (3d Cir. 1994) (citations omitted).

statutory framework and interpretive case law, being somewhat complex, I discuss them separately here, in Section III, in advance of applying the law to the facts in Section IV.

The FHAA makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1); *see Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005). The statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Similarly, the ADA, which applies to public entities, and the Rehabilitation Act, which applies to public and private entities that receive federal funding, both prohibit disability-based discrimination. Both statutes require that "reasonable accommodations be made if necessary for an equal opportunity to receive benefits from, or participate in, programs run by such entities." *In re Lapid Ventures, LLC*, No. 10-6219 (WJM), 2011 U.S. Dist. LEXIS 63973, at *14 (D.N.J. June 13, 2011).

"Since the requirements of the FHAA, ADA and Rehabilitation Act are essentially the same, courts have concluded that the FHAA analysis can be applied to ADA and Rehabilitation Act claims as well in such cases where claims are brought under all three statutes." *In re Lapid Ventures, LLC*, 2011 U.S. Dist. LEXIS 63973, at *14 (citing *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 45-46 (2d Cir. 2002)); *see also McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 823-24 (W.D. Pa. 2010) (analyzing FHAA, Rehabilitation Act, and ADA claims in accordance with the requirements of the FHAA). I will therefore streamline the analysis by considering the plaintiffs' claims under the FHAA to determine if they have a likelihood of success. [29]

---

[29] Although the point is not essential to the result, I observe that the prerequisites for applicability of the Rehabilitation Act have not been established. A municipality, by virtue of receiving federal funding, may be subject to the Rehabilitation Act. *Cf. McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 814 (W.D. Pa. 2010) (concluding that

## A. Essential elements of claim and allocation of burden

"As a predicate to success on any of these claims, a plaintiff must present a class of protected individuals, i.e. handicapped individuals." *901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment,* No. 18-2442, 2018 U.S. Dist. LEXIS 79845, at *16 (D.N.J. May 11, 2018). The FHAA defines "handicap" as follows:

(h) "Handicap" means, with respect to a person—

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment[.]

42 U.S.C. § 3602(h); *see also* 42 U.S.C. § 12102 (providing definition of "disability" under the ADA); 29 U.S.C. § 705(9) (providing definition of "disability" under the Rehabilitation Act). "Courts generally consider individuals deemed to be 'handicapped' under the FHA to likewise be 'disabled' within the meaning of the Rehabilitation Act and the ADA." *McKivitz,* 769 F. Supp. 2d at 821 (citation omitted).[30]

In the context of a zoning application affecting yet-unidentified prospective tenants, the court's determination of "handicap" is based on "the criteria for admission to the facility at issue." *Id.* at 822 ("the issue of 'handicap' is sometimes examined not only by reference to the characteristics of the *individuals* in question, but also by reference to the criteria for admission to the *facility* at issue." (emphasis in original) (citing *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 47-48 (2d Cir. 2002) (finding that

---

Rehabilitation Act applied to Township because "Township's solicitor stated that Stowe Township had received federal financial assistance in 2007 and 2008."). It may be that Plainfield receives federal funds, but no such evidence was presented.

[30]     The Court is well aware of legitimate concerns about the implications of various labels for members of this protected class. I must, however, take the language of the statutes and case law as I find them. For that reason, this Opinion will use the terms "disabled" or "handicapped" interchangeably, without necessarily endorsing them.

residents of halfway house for recovering alcoholics qualified as handicapped and disabled based on New York state regulations prescribing admission criteria for such facilities) *and Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1010 (3d Cir. 1995) (observing that "no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care")); *see also Brooker v. Altoona Hous. Auth.*, 2013 U.S. Dist. LEXIS 82228, at *28 n.7 (W.D. Pa. June 12, 2013) (noting that "[r]esidency in the Eleventh Street Tower was apparently limited to 'disabled' and 'elderly' individuals.").

A plaintiff may prove a violation of the FHAA (or the ADA or Rehabilitation Act) in one of the three following ways: (1) a showing of disparate treatment, or intentional discrimination; (2) a showing of disparate impact; or (3) a showing of a refusal to make reasonable accommodations. *901 Ernston Rd., LLC*, 2018 U.S. Dist. LEXIS 79845, at *16-17; *Lapid Ventures, LLC*, 2011 U.S. Dist. LEXIS 63973, at *14-15. Chiefly at issue here is the third alternative, the City's alleged refusal to make a reasonable accommodation.

To state a claim for discrimination due to the defendant's failure to make a reasonable accommodation, the Third Circuit requires the plaintiff to show:

[1] a *refusal* to make

[2] *reasonable accommodations* in rules, policies, practices, or services,

[3] when such accommodations may be

[a] *necessary* to afford such person

[b] *equal opportunity* to use and enjoy a "dwelling."

*Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (quoting 42 U.S.C. § 3604(f)(3), (f)(3)(B)) (alteration in original); *see Revock v. Cowpet Bay West Condominium Assn.*, 853 F.3d 96, 110 (3d Cir. 2017).

If the plaintiff carries its initial burden as to [3] necessity and equal opportunity, "the burden then shifts to the defendant to show that [2] the requested accommodation is unreasonable." *Lapid-Laurel*, 284 F. 3d at 457;

*see id.* at 458 ("While a plaintiff is in the best position to show what is [1] necessary to afford its clients (i.e., the handicapped population that it wishes to serve) [2] an equal opportunity to use and enjoy housing, a defendant municipality is in the best position to provide evidence concerning what is [3] reasonable or unreasonable within the context of its zoning scheme.") ([bracketed] numbering added to quotations).

To show a requested accommodation is "unreasonable," the municipality must demonstrate that it could not have granted the accommodation without (1) imposing undue financial and administrative burdens; (2) imposing an undue hardship on the municipality; or (3) requiring a fundamental alteration in the nature of the zoning program. *Id.* at 457, 462; *accord Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1104 (3d Cir. 1996)).

Before discussing the elements one by one, I make a couple of observations about the case law's treatment of them in light of the burden-shifting scheme.

First, federal housing-discrimination challenges tend to arise in one of two contexts: (a) an existing facility's conditional or unconditional refusal to sell or lease to a member of a protected class; or (b) a zoning board's decision barring construction or a use variance that would ultimately benefit members of a protected class. [31] Many interpretive difficulties arise in applying type (a) precedent to type (b) cases, or vice versa. Thus a landlord's refusal to rent an available unit to a handicapped individual, or to make a modest practical adjustment so that that can occur, may be difficult to justify. [32] A zoning

---

[31]    *Compare Vorchheimer,* 903 F.3d at 103 (claim that condominium failed to accommodate tenant's hypertension by barring her from leaving walker in lobby of building) *with Lapid-Laurel,* 284 F.3d at 449 (claim that zoning board failed to make reasonable accommodation when it denied plaintiff's request for variances and site plan approval to build 95-bed facility for elderly handicapped in residential area).

[32]    In the landlord-tenant context, the Third Circuit had no difficulty finding that other available alternatives might render a particular accommodation demanded by the plaintiff unnecessary. *See Vorchheimer,* 903 F.3d at 108, 113 (FHAA did not require condominium to permit plaintiff to park her walker in the lobby, given the

board's refusal to grant a variance from neutral municipal land-use plans in a particular zone, however, may pose distinct issues. *See, e.g., McKivitz*, 769 F. Supp. 2d at 826.

Second, the cases tend to discuss similar factors, but are inconsistent regarding the particular statutory element—*i.e.*, necessity, equal opportunity, or reasonableness—to which that factor is relevant.[33] It may matter in an

---

condominium's willingness to have a staffer store and carry the walker when the plaintiff required it).

[33]   The availability of alternative facilities elsewhere in the area (whether or not the court considered it an appropriate factor) has been variously considered under the elements of necessity, equal opportunity, or relevance. Consider, for example, the following cases:

[1] Interpreting requirement that accommodation be "necessary"

> *Compare Bryant Woods Inn v. Howard Cnty.*, 124 F.3d 597, 605 (4th Cir. 1997) ("necessary" element not met in zoning-variance case because other group homes in the area have vacancies), *with ReMed Recovery Care Ctrs. v. Twp. of Willistown*, 36 F. Supp. 2d 676, 685 (E.D. Pa. 1999) (availability of other housing in the area does not "render unnecessary" an accommodation that would permit residents to live at the particular facility of their choice).

[2] Interpreting element of "equal opportunity" to occupy a "dwelling"

> *Compare Oxford House-Evergreen v. City of Plainfield*, 769 F. Supp. 1329, 1344 (D.N.J. 1991) (rejecting City's contention that zoning plan did not deny "equal access 'because there other locations in the City in which members would be permitted to establish a group home without infringing on any zoning ordinance.'"), *with Oxford House, Inc. v. Babylon*, 819 F. Supp. 1179, 1185 n.10 (E.D.N.Y. 1993) (FHAA "dictates that a handicapped individual must be allowed to enjoy a particular dwelling, not just some dwelling somewhere in the town.")

[3] Mixed necessary/equal opportunity approach.

> *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1225 (11th Cir. 2008) ("Although Gulf Coast may operate halfway houses in other areas of Treasure Island, the essential question in reasonable accommodation cases is whether the handicapped have an equal opportunity to live in the dwellings of their choice, not simply an opportunity to live somewhere in the City. The language of the statute suggests as much by requiring an 'equal opportunity to use and enjoy a dwelling,' 42 U.S.C. § 3604(f)(3)(B) (emphasis added), rather than an equal opportunity to live in a city.") This reasoning occurred under the topic heading "Necessity," however, and it speaks in terms of reasonable accommodation generally.

> *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 826 (W.D. Pa. 2010), invoked the "equal opportunity" prong in interpreting the term "'a dwelling,' when employed in the zoning context, to mean a generic dwelling located in a

individual case because the plaintiff has the burden as to the first two, but the defendant has the burden as to the third. Of course it is difficult to segregate the evidence strictly; the same facts may be relevant to one, two, or all three of the elements.

Looking ahead, because I am reviewing a zoning board decision adverse to the plaintiff, I have taken a conservative approach. As to the necessity and equal protection elements, I have given Yates the benefit of a narrow construction in determining whether it met its initial burden. The Board-favorable factors I will consider primarily in connection with the third, reasonableness element, as to which the Board has the burden.[34]

---

residential area rather than a specific dwelling of a particular handicapped individual's own choosing." . . . "Where a generally-applicable zoning regulation is the 'rule' or 'policy' at issue, the phrase 'a dwelling' must be read through the prism of the community as a whole."

*McKivitz* also turned on necessity, however: "The Plaintiffs have presented no evidence concerning the availability (or unavailability) of group residences in Stowe Township. The Plaintiffs base their entire case on the unavailability of 'group residences' in a single residential area of Stowe Township. . . . In order to shift the burden of proving 'unreasonableness' to the Defendants, the Plaintiffs must establish a nexus between the proposed accommodations and their necessity for providing handicapped individuals with an equal opportunity to live in a residential area of Stowe Township." *Id.*

[4] Interpreting requirement that requested accommodation be "reasonable"

*Lapid-Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 459 (3d Cir. 2002) (discussed in text, *infra*).

*Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996) (discussed in text, *infra*).

*Dr. Gertrude A. Barber Ctr., Inc. v. Peters Twp.*, 273 F. Supp. 2d 643, 654 (W.D. Pa. 2003) (Town's insistence on minimum one-acre lot size "is not a reasonable accommodation, since it would preclude the Barber Center's residents from living in the home and neighborhood of their choice.")

[34]     Separate consideration of the elements may require some patience. Consider, for example, the requirement that the accommodation be "necessary" to ensure equal access. An absurd example can easily be imagined; the plaintiff may propose, for example, the construction of a ramp to ensure access to a 30th-floor apartment, an engineering feat reminiscent of the construction of the pyramids. The temptation is to cut off analysis there on the rationale that the proposed ramp is not "necessary" given the availability of more practical alternatives. Some of the cases cited in the footnote immediately preceding have taken that approach. But assume that the plaintiff is

## B. Proposed accommodation must be "necessary"

A plaintiff must show that an accommodation is "necessary." To be clear, "[t]he FHA does not require accommodation wherever convenient or desired, but only where necessary." *Simpson v. Harbilas*, 2018 U.S. Dist. LEXIS 149235, at *21 (M.D. Pa. Aug. 30, 2018) (internal quotation and citation omitted); *see also Sporn v. Ocean Colony Condo. Ass'n*, 173 F. Supp. 2d 244, 252 (D.N.J. 2001) ("accommodation is required only where such measures may be necessary to afford such a [handicapped] person equal opportunity to use and enjoy a dwelling' and need only be 'reasonable.'" (alteration in original) (citing 42 U.S.C. § 3604(f)(3)(B))).

A plaintiff, in order to satisfy its initial burden under § 3604(f)(3)(B), "must, at a minimum, demonstrate that the proposed accommodations will 'affirmatively enhance' a handicapped person's quality of life 'by ameliorating the effects of [his or her] disability.'" *McKivitz*, 769 F. Supp. 2d at 824 (citation omitted). To show that a requested accommodation is "necessary," plaintiffs "must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Lapid-Laurel*, 284 F.3d at 460 (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996) (internal quotation marks omitted)).

The Third Circuit in *Vorchheimer* recently clarified the exacting standard imposed by the "necessary" element. *See* 903 F.3d at 105 ("'[N]ecessary' means 'required.' It is a high standard."). In order for an accommodation to be "necessary . . . it must be required for that person to achieve equal housing opportunity, taking into account the alternatives on offer." *Id.* at 103, 107 ("The text pegs the necessity to the goal of providing the particular tenant with equal

---

indeed handicapped and has demonstrated that assistance of some kind is required if she is to have access to the apartment. The better approach, I think, is to find that the plaintiff met her initial burden as to necessity, and to consider practicalities and alternatives in connection with the defendant's burden to show that the accommodation sought is not "reasonable."

housing opportunity."). An accommodation must "be essential, not just preferable." *Id.* at 107.[35]

In a zoning case, "to establish necessity, the plaintiff has 'to show that [the requested zoning variance] is required" to make the proposed facility "financially viable or medically effective.'" *Vorchheimer*, 903 F.3d at 109 (quoting *Lapid-Laurel*, 284 F.3d at 461) (alteration in original). Particularly in this zoning context, the plaintiff must demonstrate "that the size of the proposed facility either would be necessary for the facility's financial viability (and therefore necessary to give the handicapped an equal opportunity to live in a residential neighborhood) or would serve a therapeutic purpose, (and would therefore be necessary to ameliorate an effect of the handicap)." *Id.* (internal quotations and citation omitted); *see Bryant Woods Inn*, 124 F.3d at 605 (concluding that municipality did not need to allow group home to expand because there was "no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful"); *see also Keys Youth Servs., Inc. v. City of Olathe*, 75 F. Supp. 2d 1235 (D. Kan. 1999), *aff'd in relevant part*, 248 F.3d 1267 (10th Cir. 2001) (cited with approval in *Lapid-Laurel*, 284 F.3d at 450) (holding that plaintiff failed to meet its burden to show that minimum of ten residents was required for its group home's financial viability).

To establish necessity based on either therapeutic purpose or financial viability, it is not sufficient to show that a home with more residents or units is generally beneficial or more economical to run. An applicant must produce

---

[35]    It is analytically useful to consider the "necessary" element in isolation—*i.e.,* to temporarily beg the question "Necessary for what?" Whether the accommodation in fact furthers the statutory goals of equal access may then be considered in relation to the second, "equal opportunity" element. The division between these elements, to be sure, is somewhat artificial, and some cases have melded the two. Some, for example, have found that the "necessary" element itself requires "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person." *McKivitz*, 769 F. Supp. 2d at 824 (quoting *Bryant Woods Inn*, 124 F.3d at 604 (internal quotation marks omitted)). That said, it probably does not matter whether the elements are considered separately or together, as long as they are both considered, and both considered in relation to the whole. *See also* n.33 & 34, *supra.*

evidence showing why the number of units requested is necessary. *See Lapid-Laurel*, 284 F.3d at 461 (concluding that plaintiff failed to establish therapeutic value even though gerontologist "testified that assisted living facilities . . . that contained between 80 and 100 beds 'seem to work very well,'" but did not specify "that care facilities for the elderly that are smaller than the proposed facility are unable to provide the range of care required or that it would be economically infeasible to operate a smaller facility."); *Bryant Woods*, 124 F.3d at 605 (concluding that "nothing in the record . . . suggests that a group home of 15 residents, as opposed to one of 8, is necessary to accommodate individuals with handicaps."); *Dr. Gertrude A. Barber Ctr.*, 273 F. Supp. 2d at 652–53 (finding plaintiff met necessary element establishing that four, as opposed to three, residents were required for licensed home that housed mentally disabled residents because home was "a particular type of state licensed and regulated residential facility that must have at least four residents" in order to maintain its license and government funding); *cf. City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803 (9th Cir. 1994) (noting that "house must have 6 or more residents to ensure financial self-sufficiency, to provide a supportive atmosphere for successful recovery, and to comply with federal requirements for the receipt of state start-up loans."), *aff'd sub nom. City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 115 S. Ct. 1776 (1995).

In gauging necessity, courts can consider the experience of comparable facilities.[36] *See Bryant Woods*, 124 F.3d at 605 (concluding that zoning variance to expand facility from eight to fifteen persons was not necessary where plaintiff had "introduced no evidence that group homes are not financially viable with eight residents. On the contrary, the record before the board shows that almost 30 such homes operate viably in Howard County with

---

[36] To be clear, those facilities would not to be considered as alternative places to send Yates's would-be tenants. They are what a real estate appraiser would call "comparables," *i.e.*, evidentiary exemplars of what it takes for a facility to be viable.

8 or fewer residents."). Relatedly, "the proper inquiry is not whether 'a particular profit-making company needs such an accommodation, but, rather do such businesses as a whole need this accommodation. Otherwise, by unreasonably inflating costs, one business would get such an accommodation while another, better run, did not." *Id.* (quoting *Smith & Lee Assoc.*, 13 F.3d at 931-32 ("The need for a further accommodation by increasing the number of occupants to twelve is Smith & Lee's need, which is unable to make a reasonable profit in this home with only six occupants. This need does not appear to exist for other operators of group homes.")).

### C. Equal opportunity

The "necessity" of the first element is directed to a particular goal. That is, the requested accommodation must be necessary "to afford handicapped persons an *equal opportunity* to use and enjoy a dwelling." *Lapid-Laurel,* 284 F.3d at 457 (emphasis added). The Third Circuit has approvingly cited the Sixth Circuit's holding that the FHAA defines "equal opportunity" as providing "handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream." *Id.* at 459–60 (quoting *Smith & Lee Assocs.*, 102 F.3d 781); *see also Bryant Woods Inn, Inc. v. Howard Cnty.*, 911 F. Supp. 918, 946 (D. Md. 1996) ("The Act prohibits local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less opportunity to live in certain neighborhoods than people without disabilities."), *aff'd*, 124 F.3d 597 (4th Cir. 1997).

There was evidence in this case that Yates's proposed facility could be built elsewhere in Plainfield without violating, *e.g.,* density or use limits. (DBr at 8, 11, 14; *see also* Resolution Conclusions at 46, ¶5 ("there are numerous residential zones within the City in which densities are permitted in an amount equal to or exceeding the density proposed by the Applicant.")). The case law

has much to say about whether the existence of alternatives elsewhere in the area can satisfy the goal of "equal opportunity."

In the zoning context, courts are divided on whether "equal opportunity" requires that a tenant be accommodated in a particular dwelling, or whether the availability of housing within a zoning authority's territorial jurisdiction satisfies this element. *See McKivitz*, 769 F. Supp. 2d at 825 (citing cases); *see Bryant Woods*, 911 F. Supp. at 946 (noting that FHAA prohibits "local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less opportunity to live in certain neighborhoods than people without disabilities.").

The FHAA requires that the accommodation be necessary to afford the plaintiff an "equal opportunity to use and enjoy *a dwelling*." 42 U.S.C. § 3604(f)(3)(B) (emphasis added). That singular terminology tends to suggest that the individual facility, rather than access to other or similar facilities, is the focus of this element.[37]

The purpose of the FHAA, in general, as expressed in the House Report,[38] is as follows:

---

[37] Of course, "a" is an indefinite article, and "a [noun]" may have a generic sense. I do not suggest that in a particular case, the particularized sense of "a" dwelling is excluded. Consider, for example, an identified tenant's claim of discrimination by an identified landlord in an existing facility. *That* tenant may sue based on her exclusion from *that* apartment building.

Prospective statutes, rules, or commands, however, may indifferently use the definite or the indefinite article, because the particular situation to which they will be applied has not yet arisen. *Cf. Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1284 n.4 (1991) (refusing to distinguish between "the" and "an" in interpreting statute because that approach was "overly formalistic and inconsistent with Supreme Court case law." (citing *Barr v. United States*, 324 U.S. 83, 90-92, 89 L. Ed. 765, 65 S. Ct. 522 (1945) (holding that "the buying rate" for foreign currency under the Tariff Act of 1930, 31 U.S.C. § 372, included more than one buying rate)); "Get a Job," https://genius.com/Silhouettes-get-a-job-lyrics (no particular position specified).

[38] "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed

40

> The Fair Housing Amendments Act, like Section 504 of the
> Rehabilitation Act of 1973, as amended, is a clear pronouncement
> of a national commitment to end the unnecessary exclusion of
> persons with handicaps from the American mainstream. It
> repudiates the use of stereotypes and ignorance, and mandates
> that persons with handicaps be considered as individuals.

H.R. REP. 100-711, 18, 1988 U.S.C.C.A.N. 2173, 2179. The use of the phrase
"the unnecessary exclusion of persons with handicaps from the American
*mainstream*" might suggest that the Act, at least in general, is aimed at
exclusion from the stereotypical American dream of residential-neighborhood
living. *See generally Lapid-Laurel*, 284 F.3d at 459-60; *Smith & Lee*, 102 F.3d
781; *Bryant Woods Inn*, 911 F. Supp. at 946. The same House Report, however,
suggests a focus on a person's choice of a specific residence, as opposed to
more general access to a residential area:

> The Committee intends that the prohibition against discrimination
> against those with handicaps apply to zoning decisions and
> practices. The Act is intended to prohibit the application of special
> requirements through land-use regulations, restrictive covenants,
> and conditional or special use permits that have the effect of
> limiting the ability of such individuals *to live in the residence of
> their choice in the community*.

H.R. REP. 100-711, 24, 1988 U.S.C.C.A.N. 2173, 2185 (emphasis added).

Based on, *inter alia,* this latter quotation, the United States Court of
Appeals for the Eleventh Circuit has ruled out consideration—for these
purposes—of the availability of housing elsewhere within the zoning authority's
territorial jurisdiction. *Schwarz*, 544 F.3d 1201. To some degree melding the
"necessity" and "equal opportunity" elements, *Schwartz* held that "the essential
question in reasonable accommodation cases is whether the handicapped have
an equal opportunity to live in the dwellings of their choice, not simply an
opportunity to live somewhere in the City. The language of the statute suggests
as much by requiring an 'equal opportunity to use and enjoy a dwelling,' 42

---

legislation.'" *Garcia v. United States*, 469 U.S. 70, 76 (1984) (internal citations
omitted).

U.S.C. § 3604(f)(3)(B) (emphasis added), rather than an equal opportunity to live in a city." *Id.* at 1225. Thus, *Schwartz* "conclude[d] that the availability of another dwelling somewhere within the City's boundaries is irrelevant to whether local officials must accommodate recovering substance abusers in the halfway houses of their choice."[39] *Id.* at 1225–26

The weight of authority, then, and the legislative history as it relates to zoning decisions, suggest that the availability of alternative housing located elsewhere within the zoning authority's territorial jurisdiction is not relevant to the element of "equal opportunity." To that precedent I add a few of my own thoughts.

I am wary of any interpretation that would permit a defendant to say that there is equal access because someone else is providing it. The wording of the statute suggests to me that it is not receptive to arguments based on NIMBY ("not in my back yard") or separate-but-equal reasoning. That kind of false "accommodation," in my view, is very different from a landlord's offer of an alternative *means* of accommodating a tenant's disability (a ramp vs. an elevator, or a less disruptive location to store a walker).

I consider also that as to this, the equal-opportunity element, the plaintiff has the burden of proof, based on the rationale that the plaintiff would naturally be in possession of most of the relevant facts. On that theory, I will take the narrower view and assume that "equal opportunity" means an equal opportunity to use and enjoy the particular facility proposed by Yates, a matter as to which Yates should possess the pertinent evidence. By satisfying its

---

[39]     In *Schwarz*, the plaintiff sought an accommodation in the form of relaxation of an occupancy-turnover rule. The facilities at issue were six halfway houses, four of which were located in a multi-family/apartment zone and two of which were located in a single-family zone. The Eleventh Circuit determined that accommodating those facilities in the multi-family/apartment zone was reasonable since "the developer sought permission for a land use that was 'similar' to uses already permitted." 544 F.3d at 1225. *Cf. Erdman v. City of Fort Atkinson*, 84 F.3d 960, 963 (7th Cir. 1996) (expressing "skepticism" where "the district court concluded that what the plaintiffs must show is inequality of opportunity to live in the city," but statute "refers specifically to inequality of opportunity to live in a dwelling.").

42

burden under this lower and more focused inquiry, the plaintiff shifts the burden to the defendant to demonstrate overall reasonableness.

### D. Reasonableness

A more broad-ranging inquiry into citywide conditions, I believe, is better considered in relation to the ultimate issue of the "reasonableness" of the City's rejection of the proposed accommodation. The zoning cases have recognized as much. They require that "[w]e balance the City's interests against the need for an accommodation in this case." *Smith & Lee Assocs.*, 102 F.3d at (citing earlier appeal in same case, 13 F.3d at 931). It is here that the City's more general zoning plan more naturally comes into play—*not* because the handicapped person could "just live somewhere else," but because neutral, nondiscriminatory zoning regulations of general application have their own countervailing force.

Thus it is well-established in zoning cases that "in order to 'establish that the accommodation proffered by [the applicant] was not reasonable, [the municipality] [i]s required to prove that it could not have granted the variance without:' (1) 'imposing undue financial and administrative burdens;' (2) 'imposing an "undue hardship" upon the Township;' or (3) 'requiring a fundamental alteration in the nature of the [zoning] program.'" *Lapid-Laurel*, 284 F.3d at 462 (quoting *Hovsons*, 89 F.3d at 1104 (internal citations and quotation marks omitted)).[40]

---

[40] The Third Circuit's three-part test is binding on me, *tout court*. That said, I find persuasive District Judge McVerry's canny explication of the likely rationale for the Third Circuit's adoption of a specialized approach to the issue of what is "reasonable" in the context of zoning cases, as opposed to one-on-one claims of discrimination:

The Court acknowledges that the phrase "a dwelling," when applied in a case involving an individual landlord, refers to the specific "dwelling" at issue. *Giebeler v. M & B Associates*, 343 F.3d 1143, 1146–1147 (9th Cir. 2003). Under ordinary circumstances, "the same language in a single statutory provision cannot have two different meanings." *Johnson v. McNeil*, 217 F.3d 298, 301 (5th Cir. 2000). In this context, however, the phrase "a dwelling" cannot be divorced from the remainder of the subsection of which it is a part. Both landlords and zoning authorities are required "to make reasonable accommodations in rules, policies, practices, or services" where necessary to afford handicapped individuals

To explore the meaning of those concepts, I start with the "reasonableness" analysis of *Hovsons*, 89 F.3d 1096.[41] There, the town had barred construction of a nursing home in any area zoned residential, but offered to accommodate the plaintiff by allowing it to be constructed in an area zoned for hospitals and other medical support facilities. *Id.* at 1103. ("Brick Township does not permit the construction of nursing homes in any of its residential areas. The Township nonetheless contends that the authorization for nursing home construction within its hospital support zone, an area zoned for hospitals and other medical support facilities, suffices to satisfy its legal obligation to handicapped persons. We disagree."). The Court of Appeals held that the hospital-zone location was not a reasonable accommodation because Brick Township would have *entirely* barred the protected class members from living in *any* residential-zoned neighborhood.[42]

---

an equal opportunity "to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Landlords and zoning authorities, however, are not similarly situated in any other respect. An individual landlord is merely a market participant seeking to apply "rules" and "policies" to his or her own property, whereas a zoning authority is a market regulator entrusted with the duty to implement "rules" and "policies" applicable to an entire community. Where a generally-applicable zoning regulation is the "rule" or "policy" at issue, the phrase "a dwelling" must be read through the prism of the community as a whole.

*McKivitz*, 769 F. Supp. 2d at 826–27.

Thus a landlord cannot escape the statutory obligation to supply (reasonable) access by arguing that the tenant can, *e.g.*, simply move to some other building that has a ramp. A municipality's legitimate, neutral zoning rules, however, may offset the necessity of locating a facility in a particular place, as long as access to residential areas is not restricted.

[41]    The Third Circuit has twice clarified that *Hovsons* should be read as an application of the "reasonableness" element. *See Vorchheimer*, 903 F.3d at 109 ("Our decision in *Hovsons* addressed the reasonableness element and who bears the burden of proving it, not what is necessary."); *Lapid-Laurel*, 284 F.3d at 457 ("*Hovsons* focused mainly on the meaning of the 'reasonable accommodations' part of § 3604(f)(3)(B), as opposed to the meaning and import of the terms 'necessary' and 'equal opportunity.'").

[42]    Looked at this way, *Hovsons* is just a less extreme version of the case where the requested use is not allowed *anywhere* within a municipality. *See Dr. Gertrude A. Barber Ctr.*, 273 F. Supp. 2d at 654 (noting that accommodation was necessary to afford equal opportunity to disabled residents because there was no zoning district

It is possible to read *Hovsons* as a wholesale rejection of any consideration of alternatives to a single, identified "dwelling." *See McKivitz*, 769 F. Supp. 2d at 825. That interpretation, I think, is overbroad; the holding of *Hovsons* must be understood in the context of its facts and rationale. What the township was proposing in *Hovsons* amounted to ghettoization, if not outright banishment, of the handicapped. It went counter to the purpose of the statute to mainstream the housing of protected persons into residential neighborhoods.

Much of the Third Circuit's reasoning in *Lapid-Laurel* is likewise neighborhood-based; it is consistent with *Hovsons'* mainstreaming, anti-ghettoization rationale. The language in *Lapid-Laurel* leaves no doubt as to the Court's view that the statute, at least in the zoning context, primarily protects the right of handicapped persons to live in a single-family or residential neighborhood, as opposed to a specific residence. Examples abound: *See, e.g.*, 284 F.3d at 459 ("the FHAA defines 'equal opportunity . . . [to] giv[e] handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream."); *id.* at 460 ("Other courts have also recognized that the equal opportunity to live in a residential zone is valid under § 3604(f)(3)(B)."); *id.* ("The 'equal opportunity' that Lapid seeks to provide here is the opportunity for handicapped persons to live in a single-family residential neighborhood. . . . No institutional health care facilities are permitted without a use variance in the neighborhoods zoned R–1 residential in Scotch Plains."); *id.* at 461 ("We therefore do not think that . . . a reasonable jury could find that Lapid had shown that the specific features of its proposed facility (its size in particular) were 'necessary to afford [handicapped] ... person[s] [an] equal opportunity' to live in a residential neighborhood in Scotch

within township "in which four unrelated persons with mental retardation are permitted to live in a single household."); *Cmty. Servs.*, 439 F. Supp. 2d at 399 (finding variance necessary to achieve an equal opportunity for prospective residents to reside in "any district in the Township.").

Plains."). *See also McKivitz*, 769 F. Supp. 2d at 825–26 (concluding that *Lapid-Laurel* "declared that the 'equal opportunity to use and enjoy a dwelling' mandated by the FHA is essentially 'the opportunity for handicapped persons to live in a single-family residential neighborhood,'" but not "the right to live in a specific facility in such an area.")[43]

In my analysis, then, I will read *Lapid-Laurel*'s tripartite test of reasonableness in light of its overall concern that zoning restrictions not restrict handicapped persons' ability to obtain mainstream housing in residential neighborhoods.

## IV. Discussion

As noted above, a preliminary injunction will issue based on (a) a reasonable probability of success on the merits; (b) irreparable injury; (c) the balance of harms; and (d) the public interest. Particular scrutiny is required where, as here, the plaintiff seeks affirmative relief—indeed, relief tantamount to a victory on the merits. *See* Section II, pp. 27–28, *supra*.

### A. Reasonable probability of success

I proceed to the essential issue of the likelihood of Yates's success on the merits of the reasonable-accommodation claim.

#### 1.     *Protected Class*

As a prerequisite to any FHAA claim, plaintiffs must establish that they (or the people for whom the facility is being built) are handicapped. On this score, plaintiffs have been equivocal. Their briefing simplistically implies that the population to be served consists of veterans who suffer from PTSD, a disability that would entitle them to protected status under the FHAA. I am not

---

[43]     Still, accord is not universal. *ReMed Recovery Care Ctrs.*, 36 F. Supp. 2d at 685 ("The fact that other housing in and around Willistown is available for ReMed residents does not render unnecessary the accommodation that would enable ReMed residents to live in the house of their choice, the one at 84 Devon Road."); *Oxford House-Evergreen*, 769 F. Supp. at 1344 (rejecting defendants' "argument that the City's actions do not operate to deny [plaintiff] equal access 'because there other locations in the City in which members would be permitted to establish a group home without infringing on any zoning ordinance[.]' . . . Anti-discrimination laws are designed to prevent just such discriminatory segregation.").

persuaded, however, that the correspondence between veterans and PTSD sufferers is anything like one-to-one. And Yates has not quantified what that correspondence may be.

Yates, which may define the admission criteria for its facility any way it likes, did not at any time agree to limit admission to PTSD sufferers. *See McKivitz*, 769 F. Supp. 2d at 821. Indeed, it was not until the fourth day of testimony that the attorney for Yates even agreed to deed-restrict the property to veterans at all. And never did Yates state that the residency would be confined to veterans *with PTSD*.

The variance applications, then, are an imperfect proxy for the FHAA claims, which apply only to the subset of residents who would be members of the protected class of persons with a disability. Yates never demonstrated what percentage of the residents would be PTSD sufferers; nor, conversely, did it state what percentage would be mere tag-alongs (with respect to the FHAA claims, that is). At best, Yates established there likely would be a significant percentage of PTSD sufferers among the homeless veteran population.

Although Yates's rhetoric tended to suggest it, the proposed facility is not one for PTSD sufferers as such. If plaintiffs wished to take advantage of the special protections afforded individuals with PTSD, they could have proposed a facility that limited admission to such persons. They did not do so. Nor did they submit persuasive proof that there exists some ratio of PTSD/non PTSD occupants that might be required to sustain the facility's viability or therapeutic efficacy in relation to the subclass of PTSD-afflicted occupants.

The likelihood of success, then, must initially be discounted to account for Yates's failure to establish a tight connection between the accommodations sought and the protected class. I now address other substantive elements of the claims, which I also find lacking.

2. *Whether the variances were "necessary" to ensure "equal opportunity"*

The first two elements, as to which plaintiffs have the burden of proof, are that the requested accommodation be "necessary" to ensure "equal

opportunity" for members of the protected group to live in a dwelling. As noted above, I have given these elements a somewhat narrow, *i.e.*, plaintiff-favorable, construction so that the burden of proof rests on Yates only to the extent it can be expected to possess the relevant facts. *See* Sections III.B & C, *supra*.

The most hotly contested aspects of Yates's application were (a) the proposed use variance to allow for the construction of an apartment building in the historic zone; (b) the density variance to allow for a rate of 36.2 units (as opposed to the permissible two) per acre; (c) height variance and bulk variances required for a facility of that height; and (d) a downward variance from the 500 square foot minimum size requirement for the proposed units. To satisfy the "necessary" element, Yates was required to show that these multiple and fairly drastic variances were necessary to (a) fulfill the facility's therapeutic purpose or (b) make it financially viable.

Regarding therapeutic purpose, there was general testimony that group living is beneficial to persons experiencing this disability, *i.e.*, PTSD. However, there was no testimony attesting specifically that 25 units, or the anticipated 36 residents therein, were needed to achieve that therapeutic benefit. *See Lapid-Laurel,* 284 F.3d at 461 (concluding that plaintiff failed to establish therapeutic value even though gerontologist "testified that assisted living facilities . . . that contained between 80 and 100 beds 'seem to work very well,'" but did not specify "that care facilities for the elderly that are smaller than the proposed facility are unable to provide the range of care required or that it would be economically infeasible to operate a smaller facility."); *Bryant Woods Inn,* 124 F.3d at 605 (concluding that municipality did not need to allow group home to expand because there was "no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful").

Here, too, the failure to commit to any particular number of PTSD sufferers impaired the application. Neither a particular number of PTSD-afflicted veterans, nor the number of veterans not so afflicted among whom they might live, was linked to any incremental therapeutic benefit from group

living. Accordingly, I agree with the Board that the plaintiffs did not demonstrate that the particular size of the proposed facility was necessary or essential to its therapeutic benefit.

Turning to financial viability, Yates presented the testimony of Ms. Coe, an affordable housing expert, who opined that 25 units were necessary to make the facility financially feasible. The Board rejected Coe's opinion because it was a *pro forma* calculation that parroted financial figures provided to her by Yates.[44] In fact, the only verified financial figure in Coe's *pro forma* workup—the purchase price of the property—was demonstrably inconsistent with public records. Coe's opinion, presumably based on input from Yates, inflated the purchase price from $100,000 to $300,000, thereby increasing costs in a manner that would exaggerate the need for a larger facility. The remaining figures in the *pro forma* were stated, but not verified or supported by any evidence of record. Yates provided no back-up. The Board thus acted within its discretion in declining to credit this expert's unsupported testimony.[45]

Coe's own testimony corroborated the lack of a sufficient factual basis for her conclusions. (4T72:22-24, 90:12-15). Specifically, Coe did not independently vouch for the figures she used for "department costs, construction costs and what it proposes in terms of operating subsidies"; those

---

[44]    It is not clear whether Mr. Yates provided Coe with any documentation to support the pro forma.

[45]    While not directly applicable to the Zoning Board proceedings, Federal Rule of Evidence 702(b) provides some analogous guidance. It mandates that an expert's opinion be "based on sufficient facts or data." An expert's testimony must "have some connection to existing facts," and "expert testimony that ignores existing data and is based on speculation is inadmissible." *Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) (citing *JMJ Enters. v. Via Veneto Italian Ice*, 1998 U.S. Dist. LEXIS 5098, at *16 (E.D. Pa. Apr. 15, 1998)). "While the *Daubert/Paoli* analysis 'does not preclude testimony merely because it may be based upon an assumption, the supporting assumption must be sufficiently grounded in sound methodology and reasoning to allow the conclusion it supports to clear the reliability hurdle.'" *Id.* (quoting *In re TMI Litigation*, 193 F.3d 613, 677 (3d Cir. 1999). Typically, an expert's reliance on information provided by a party to the case is not a basis to exclude that report and any question "as to the sufficiency of an expert's factual basis are generally left to the jury." *Id.*

figures, she testified, all came from Yates. (4T72:22-24). And Yates, when asked to disclose the underlying construction, operating, and financing costs that were contained in the *pro forma*, declined to do so. (Resolution ¶¶166-168; DE 8-24; 4T111:9). That refusal appears particularly problematic when the only figure that could be independently checked—the purchase price of the property—was off by a factor of three from the public record.

In this regard, the Board sat in the role of fact finder; its findings are entitled to substantial deference and presumed to be valid. *Cf. Price*, 404 N.J. Super. at 302 (noting that Zoning Board's factual findings are entitled to substantial deference and are presumed to be valid). I see no error in the Board's having opted to give little or no weight to Coe's opinion.

A final point regarding the "necessary" element: The Board cited the example of All Saints Apartments, consisting of 11 units of affordable housing in Highland Park. All Saints, the Board found, functioned and was financially viable without accommodations like those requested by Yates. (Resolution Conclusions at 47, ¶7). In particular, the Board noted, the apartments in All Saints were not significantly undersized like the ones proposed by Yates. *Id.* The Board also cited a veterans housing project in Basking Ridge, containing units which met that town's minimum square footage requirements. This evidence, too, convinced the Board that the relaxation of requirements for minimum unit sizes (and by extension the increased number of units) were not necessary or required for the creation of housing for veterans.[46]

The Board justifiably relied on this evidence in concluding that the requested accommodations were not necessary for this type of facility to be financially viable. *See Bryant Woods*, 124 F.3d at 605 (concluding that zoning variance to expand facility from eight to fifteen persons was not necessary

---

[46] The Board justifiably, had issues with many of the units being well below 500 square feet. This was not merely a matter of historic-district aesthetics. The Board noted that the minimum apartment size regulation that requires a studio to be at least 500 square feet "exists to protect prospective tenants from substandard living conditions." (Resolution Conclusions at 48, ¶10). The regulations were enacted to ensure "quality of life standards." *Id.*

where "the record before the board shows that almost 30 such homes operate viably in Howard County with 8 or fewer residents."). As noted above, the proper inquiry is not whether a *particular* company (here, Yates) needs such an accommodation, but, rather whether such businesses "as a whole" require it in order to function. Otherwise, by unreasonably inflating costs, or by taking on unwise levels of debt, "one business would get such an accommodation while another, better run, did not." *Lapid-Laurel*, 284 F.3d at 461 (citing *Smith & Lee Assoc.*, 13 F.3d at 931-32 ("The need for a further accommodation by increasing the number of occupants to twelve is Smith & Lee's need, which is unable to make a reasonable profit in this home with only six occupants. This need does not appear to exist for other operators of group homes.")).[47]

In sum, the plaintiffs have not sustained their initial burden as to the elements that the accommodation be "necessary" to provide "equal opportunity" to occupy a dwelling.

### 3. *Reasonableness of accommodation*

I nevertheless consider the third element—the reasonableness of the City's denial of the requested accommodations. Here, the City had the burden to show that the requested use and zoning variances would impose undue financial and administrative burdens; impose an undue hardship; or require a fundamental alteration to the City's zoning program. *Lapid-Laurel*, 284 F.3d at 462; *see* Section III.D, *supra*.

The Board concluded that the many requested variances, particularly in combination, would result in a fundamental alternation of the City's zoning plan. (Resolution Conclusions at 48, ¶10). "[A] proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an 'essential' aspect

---

[47]     Testimony in the record also established that no legitimate, investment-backed expectations were defeated here. Mr. Yates purchased this property knowing that it was a historic building located in the historic district and that the costs of renovations would therefore be higher as compared to a piece of property located elsewhere. As one of the Board members commented, "[t]he applicant essentially had notice of the zoning, and really created the hardship" in terms of requiring a substantial number of variances. (6T60:13-14).

of the relevant activity." *Schwarz*, 544 F.3d at 1220 (citation omitted). This analysis requires the Court to determine whether the use and density restrictions are "essential," and/or whether they are essential to the Van Wyck Brooks Historic District in particular. *Cf. id.* at 1221. I conclude that they are.

Whether a zoning ordinance or restriction is "essential" to a zone is fact specific, but there are several guiding principles. *Id.* "The basic purpose of zoning is to bring complementary land uses together, while separating incompatible ones." *Id.*; *City of Edmonds*, 514 U.S. at 732. Requiring "a municipality to waive a zoning rule ordinarily would cause a 'fundamental alteration' of its zoning scheme if the proposed use was incompatible with surrounding land uses." *Id.* (citing *Bryant Woods Inn*, 124 F.3d at 604 ("In determining whether the reasonableness requirement has been met, a court may consider . . . the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations.")).

On the other hand, if the proposed use is "similar to surrounding uses expressly permitted by the zoning code, it will be more difficult to show that a waiver of the rule would cause a 'fundamental alteration' of the zoning scheme. Similarly, if the municipality routinely waives the rule upon request, it will be harder to show that the rule is 'essential.'" *Id.*; *see Hovsons*, 89 F.3d at 1099 (concluding that construction of nursing home was not a fundamental alteration of the zone because proposed facility was "similar to that of the local planned residential retirement communities, a permitted use" in the zone); *see also Oxford House, Inc. v. Cherry Hill*, 799 F. Supp. 450, 462 (D.N.J. 1992) (concluding sober house would not fundamentally alter residential zone where property was surrounded "by offices, apartment buildings and duplexes. If anything, it seems that permitting its use by Oxford House as a residence would enhance rather than detract from the residential character of the neighborhood.").

Finally, although the municipality's preferences are not themselves dispositive, the City's statements of "what is essential to its zoning districts

must be considered." *Schwarz*, 544 F.3d at 1223 ("State and local officials have experience in these areas and know best the needs of their citizenry. We doubt Congress meant for the federal courts to ignore entirely the considered judgments of these officials when deciding what is reasonable in a particular case." (citation omitted)).

The Board determined that the grant of Yates' application, which required a total of thirty-eight variances and thirty-three waivers, would fundamentally alter the City's zoning scheme. The Board determined that the number of variances would result in "a substantial detriment to the pubic good." (Resolution Conclusions at 53, ¶19). The Board was particularly concerned with "the establishment of minimum apartment unit sizes; the impact to the City's historic district; and parking within the vicinity of the Subject Property." (Resolution Conclusions at 48, ¶10).

Yates proposed building a significant addition to the existing building, while still "failing to meet the minimum unit size" for a studio apartment. (Resolution Conclusions at 51-52, ¶16). The minimum unit size regulation "exists to protect prospective tenants from substandard living conditions." (Resolution Conclusion at 48, ¶10). Regulations that mandate minimum unit sizes exist to ensure "quality of life" and "to address the increase in residential densities." (Resolution Conclusions at 48, ¶10). The Board noted that the substandard units "would detrimentally affect the residents which the Applicant asserts it is seeking to assist." (Resolution Conclusions at 49, ¶10).

Moreover, the subject property would have "one-quarter of the parking spaces required," which would cause vehicles to park in the residential street, exacerbating on-street parking issues. (Resolution Conclusions at 54, ¶21). The proposed density is "roughly 18 times that maximum permitted residential density," increasing the number of residents in the district significantly. (*Id.*). The proposed height of the building would affect "light, air, and open space," especially in regard to an adjoining lot (Lot 5) that already suffered from decreased light, air, and open space due to the "existing nonconforming side yard setback of 3.8 feet" caused by the Subject Property. (*Id.*).

53

Turning to the historic goals of the City's Master Plan. The Plan is promulgated pursuant to the MLUL, which promotes the "conservation of historic sites and districts, open space, energy resources and valuable natural resources in the State and to prevent urban sprawl and degradation of the environment through improper use of land." N.J. Stat. Ann. §40:55D–2(j); *see also Price*, 404 N.J. Super. at 305 ("[T]he preservation of the character of a neighborhood or property values in that neighborhood have also been recognized as legitimate purposes of zoning.").

The Historic Preservation Element of the City's Master Plan provides, in pertinent part, as follows:

### 1. PURPOSE

The Historic Preservation Plan Element identifies Plainfield's historic resources and the standards used to assess their significance, promote historic preservation as a tool for economic development and community revitalization, and sets forth goals and strategies for historic preservation. The plan element establishes historic preservation policy for the City of Plainfield, which in turn is reflected in other components and elements of the city's master plan, the administration of its agencies and programs, and the conduct of its business.

### 2. OBJECTIVES AND POLICIES

**OBJECTIVE:** The city's historically and architecturally significant buildings and neighborhoods will be preserved and protected in accordance with the Plan's Historic Preservation Element.

**POLICIES:**

**2.4** Enhancement of Historic Districts. Capital improvements within historic districts should be designed and constructed in a manner that enhances the character of the districts and contributes to the quality of life in the districts. City capital improvement and planning projects should include a review for impacts on historic resources prior to implementation.

**2.6** Zoning in Existing Historic Districts. The city should ensure that zoning ordinances in historic districts support historic preservation and are compatible with historic building patterns and resources in the historic districts. This includes, but is not

limited to permitted uses, bulk and lot requirements, parking, lighting, signs and landscaping.

(Resolution Conclusions at 49-50, ¶11).[48]

The Board concluded, and the Court agrees, that the proposed apartment building, with its nonconforming use, density, height, and parking requirements, is inimical to the purpose, objectives, and policies of the Historic Preservation Element of the City's Master Plan.[49] On this issue, the Board adopted the analysis of the HPC, which is persuasive to this Court. (Resolution Conclusions at 50, ¶11).

The HPC concluded that the project "would interfere greatly with the character of the surrounding area, which is stately and quiet, featuring fine architecture and landscaped spaciousness, associated with the late 19th and early 20th century period when this neighborhood was developed, as a 'railroad suburb' populated by well-to-do commuters." (DE 1-2, at 58). The HPC objected to the number of proposed occupants and noted that if a resident of the facility obtained a car, he or she would likely park the car on the street for free rather than pay for parking in a lot farther away. (DE 1-2, at 58-59). Any additional

---

[48] There is no contention, by the way, that the creation of the Van Wyck Brooks historic district was a pretext for exclusion of the handicapped from residential areas in particular, or from the City of Plainfield in general. The District was established in 1981. Its description corroborates that it is tailored to its declared purposes, and it is modest in size. (Although irregular in shape, it seems to cover the equivalent of 10–12 city blocks.) I note, however, that it is not the only historic district; it is one of several, forming a band running east and west, just south of the central business district. See Zoning Map, https://www.plainfieldnj.gov/docs2015/2015-Zoning-Map-06-2015.pdf

[49] Control of population density and traffic congestion serves legitimate governmental goals. Reedy v. Borough of Collingswood, 204 F. App'x 110, 115 (3d Cir. 2006) (citing Belle Terre, 416 U.S. at 9). The MLUL recognizes that the regulation of the density of development as a general purpose of zoning that contributes to "the well-being of persons, neighborhoods, communities and regions and preservation of the environment." N.J. Stat. Ann. §40:55D–2(e). Density restrictions in the residential context serve to limit the intensity of the use of the land to be developed. Price, 404 N.J. Super. at 305. Minimum unit sizes (here, 500 square feet) likewise have more to do with living conditions generally than with historic preservation as such. Such goals are not peculiar to historic districts; they are common features of municipal zoning.

vehicles in the vicinity as well as a large number of occupants would be disruptive. (*Id.*).

Plaintiffs' argument on this issue focuses on Dudley House, which is in a historic district, but not the Van Wyck Brooks District. (PBr at 21). Thus, Yates's reliance on Dudley House to address whether Yates's proposed facility will fundamentally alter the Van Wyck Brooks Historic District is therefore not quite to the point. At any rate, this evidence does not undermine the City's overall conclusions.

Pointing to Dudley House, Yates argues that the City "is prepared to house such veterans in spaces as small as 64 square feet. . . . As such, the 256 to 595 square foot units proposed by Yates will not constitute a fundamental alteration." (*Id.*). Dudley House, however, is a transitional rooming facility for homeless veterans, not an apartment complex; it is subject to different regulations and requirements. A boarding house, for example, is not required to have a kitchen or bathroom for the units. (4T24:20-26:3). Yates's application, by contrast, was for permanent housing in the form of an apartment complex.

Although plaintiffs do not raise the issue here, I note that they submitted evidence to the Board of surrounding apartment complexes and "conversions." *See* Section I.B.5, *supra*. Such evidence could be used to suggest that the proposed use would not result in a fundamental alteration of the zone because there are already similar facilities there. I do not believe that the plaintiffs' proofs on this issue, however, were persuasive.

The plaintiffs' belief that there were eight apartment conversions within the historic zone was based on the presence of cables, which plaintiffs suggest could be indicative of multiple units with their own telephone lines, and electric meters. Whether this is sufficient to establish that these properties did, in fact, exceed the unit and density restrictions is speculative at best. Moreover, even accepting these facts as indicative of the number of units, the Yates property was still approximately nine times the density per acre as compared to these

surrounding properties. (5T58:16-59:8). Those surrounding uses, then, are not comparable to the proposed project.

Somewhat more persuasive is the image of the four neighboring "apartment complexes." (Resolution ¶181; DE 8-20). However, these four neighboring properties were developed prior to the current zoning plan, at a time when apartments were permitted in the district. (5T14:21-23). This is not a case, therefore, where the defendants have routinely waived the zoning restrictions to permit similar facilities. *Cf. Schwarz*, 544 F.3d at 1223-24 (recognizing that accommodating halfway house in district that permits multi-family dwellings was reasonable). In fact, the Board indicated that it had not approved any such non-conforming uses since the area was zoned as a historic district.

By limiting the zone to one- and two-family homes, the City intended to preserve the remaining elements of the historic district and, to the extent possible, prevent the density from increasing and thereby changing the character of the neighborhood. The City also intends to reduce the density in the historic district to the extent possible by restoring the area to one- and two-family residences. (DE 1-2, at 56-58; Resolution ¶¶19-29).

Based on this record, I conclude that defendants have met their burden in establishing that the requested accommodation was not reasonable.

### 4.    *Disparate Treatment*

Without making any such formal argument in their brief, the plaintiffs have suggested in passing that comments made by the Board evinced a discriminatory animus. Issues not properly raised in the argument section of a brief are deemed waived. *See* Section III n. 28, *supra.* I nevertheless briefly address this issue.

To establish a claim of disparate treatment, there must be evidence of discriminatory purpose motivating the action. *Cmty. Servs.*, 421 F.3d at 177. "The discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominately' into the motivation behind

57

the challenged action." *Id.* (quoting *Cmty. Hous. Tr. v. Dep't of Consumer & Reg. Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)).

In *901 Ernston, supra*, the court found a substantial likelihood of success on the merits of the plaintiffs' FHAA claims. 2018 U.S. Dist. LEXIS 79845 at *19. The plaintiffs alleged that the defendants' decision to reject the construction of a substance abuse treatment facility was discriminatory because it was based on a "not-in-my-backyard," or "NIMBY" concerns. Indeed, the court found that the defendant board members had displayed "potential animus" against recovering addicts. Evidence was provided that tended to demonstrate that the board's decision rested in part on "fears of crime and danger associated with [this substance abuse treatment facility] in their backyards." *Id.*

Here, the record before the Court is not of the same character as that in *901 Ernston*. Indeed, some effort must be expended even to discern the basis for plaintiffs' claims that the quotations from board members are expressive of negative attitudes toward the disabled. (*See* quotations at Section I.B.6, *supra*.)

Plaintiffs have not offered sufficient evidence suggesting that the denial of their application was guided by "NIMBY" concerns, or discriminatory reasons. *901 Ernston*, 2018 U.S. Dist. LEXIS 79845 at *17. The record does not reflect discriminatory intentions or statements that influenced the Board to ultimately deny the application.

The Board has presented legitimate, indeed persuasive, neutral reasons for denying the application. The Court is unable to conclude that plaintiffs have demonstrated a reasonable probability of eventual success in the litigation of their discrimination claims.

### B. Irreparable Harm

Plaintiffs argue that irreparable injury can be presumed from a finding of a violation of the FHAA. They offer no additional arguments regarding potential harm that would be caused by denial of the injunction.

As noted above, "[t]he irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. This is not an easy burden." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000) (citations omitted); *see Reedy v. Borough of Collingswood*, 204 F. App'x 110, 114 (3d Cir. 2006). Affirmative relief that alters, rather than maintains, the status quo may also be granted, but "the burden on the moving party is particularly heavy." *Am. Fin. Res., Inc.*, 2016 WL 8201959, at *2.

"[B]ecause the [FHAA] authorizes injunctive relief, some courts find a rebuttable presumption of irreparable harm where there is a substantial likelihood the defendant violated the FHA." *901 Ernston Rd., LLC*, 2018 WL 2176175, at *4 (citation omitted); *see Assisted Living Assocs. of Moorestown, LLC v. Moorestown Twp.*, 996 F. Supp. 409, 438–39 (D.N.J. 1998) (applying presumption of irreparable harm to issue injunction exempting proposed facility from zoning ordinance). However, because plaintiffs are unable to show a reasonable probability of eventual success in the litigation, irreparable harm will not be presumed.

Aside from their arguments in support of success on the merits, the plaintiffs have not presented any other basis for finding "irreparable harm." *See In re Lapid Ventures*, 2011 U.S. Dist. LEXIS 63973, at *26 (concluding that irreparable harm element not met where "the only known plaintiff at this point is Lapid, and the harm imposed on Lapid should they later win at trial is delay in building the Facility."). I note that this is not, like some other cases, a matter of discontinuing services or shutting down an existing facility; indeed, denial rather than grant of an injunction would preserve the status quo. *Cf. City of Plainfield*, 769 F. Supp. at 1345 (holding that "plaintiffs face irreparable injury from eviction, both due to loss of the house and loss of their supportive and stable living environment."); *Cherry Hill*, 799 F. Supp. at 463 (concluding that enforcing ordinance and "shutting down the [sober] house . . .would result in a high likelihood of relapse for its residents.").

## V.    Conclusion

Plaintiffs have failed to demonstrate a likelihood of success on the merits and have failed to show irreparable harm. For the reasons expressed above, plaintiffs' motion for a preliminary injunction (DE 8) is denied.

An appropriate order follows.

Dated: July 30, 2019

**Kevin McNulty**
**United States District Judge**