# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Yates Real Estate, Inc.; Yates House for Military Veterans, Inc.; and John and Jane Doe, | Civ. No. 18-12700-KM-CLW |
| **Plaintiffs,** | **OPINION** |
| v. | |
| Plainfield Zoning Board of Adjustment; City of Plainfield, | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

I have entered an order and opinion denying plaintiffs' motion for a preliminary injunction. Defendants, the Plainfield Zoning Board of Adjustment ("Board") and the City of Plainfield ("City"), seek to convert that ruling into a grant of summary judgment in their favor. (DE 30). The plaintiffs, Yates Real Estate, Inc. ("Yates RE") and Yates House for Military Veterans, Inc. ("Yates House"), oppose the conversion. (I will distinguish between the plaintiffs as necessary, but otherwise refer to them collectively as "Yates." Where applicable, I refer to Andre Yates, principal of Yates House, as "Mr. Yates.")

In 2017, Yates filed an application with the Board for thirty-eight variances and thirty-three waivers to permit it to develop a 25-unit apartment complex in the City's Van Wyck Brooks Historic District. To do so, Yates required use, density, height, and bulk variances, as well as design waivers. Yates purchased the property in 2012, knowing that the property was in the historic district and was zoned for residential use.

Between October 4, 2017 and June 6, 2018, the Board held six days of hearings on Yates's application (the "Hearing"). It was midway through the Hearing that Yates first agreed to deed-restrict the property to military veterans. Yates proffered that homeless veterans frequently suffer from Post-

1

Traumatic Stress Disorder ("PTSD"), but never agreed to confine residency to veterans with PTSD. Yates argued, however, that because the building was likely to service PTSD sufferers, several federal civil rights statutes mandated that Yates's application be granted as a reasonable accommodation.

By way of resolution dated August 1, 2018, the Board denied the application. It found that the requested variances would violate not only historic-preservation provisions as such, but also basic regulations (*e.g.*, minimum square footage of units, storage space, parking) that would apply generally to any apartment building.

On August 13, 2018, Yates filed this action against the Board and City, alleging that the denial of its application violated (1) the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("FHAA"); (2) the Americans with Disabilities Act ("ADA"); (3) the Rehabilitation Act; and (4) the New Jersey Municipal Land Use Law ("MLUL"). For current purposes, the analysis would be similar under any of the three federal statutes.

In seeking the preliminary injunction, Yates requested that this Court effectively grant its zoning application so that permits could be issued and renovations could begin at the subject property. (DE 8). The Court filed an opinion denying the request for a preliminary injunction (DE 26, the "Prior Opinion").

Counsel, on behalf of Defendants, then requested by letter that the Prior Opinion be converted into an order granting summary judgment. (DE 30). Counsel for Plaintiffs opposed that request. (DE 31). Recognizing that Plaintiffs were entitled to an opportunity to respond to the factual findings and legal conclusions in the Prior Opinion, I issued an order to show cause in writing why the Prior Opinion should not be converted into a ruling granting summary judgment to the Defendants. (DE 32). Both parties filed briefs in accordance with this order. (DE 33, DE 35). For the reasons set forth below, I now find that the Prior Opinion ought to be converted into an opinion granting summary judgment in favor of Defendants.

## I. Background[1]

The relevant facts were laid out at length in the Prior Opinion and are incorporated by reference herein. (Pr. Op. 3-26).

The order requesting that the Plaintiffs show cause why the Prior Opinion should not be converted was entered as a memorandum and procedural order on September 25, 2019. (DE 32). Plaintiffs were given 30 days to file a brief not to exceed 25 pages. (*Id.*). Within 21 days thereafter, Defendants were given the opportunity to file a responding brief not to exceed 25 pages. (*Id.*). Both parties were ordered to assume that the Court "is familiar with the arguments made for and against preliminary injunctive relief" and not to "repeat them unnecessarily." (*Id.*). Plaintiffs filed a brief in opposition to the conversion of the court's opinion on October 25, 2019 (DE 33) and Defendants filed a further brief in support on November 15, 2019 (DE 35).

## II. Standards

### A. Conversion to Summary Judgment

The standards that applied to the court's preliminary injunction decision are well settled: (1) likely success on the merits; (2) irreparable harm; (3) balance of harms; and (4) the public interest. (*See* Pr. Op. 27.)

---

[1]  Certain key items from the record are abbreviated as follows:

"DE __" = Docket Entry number in this case;

"Pr. Op." = Prior Opinion denying preliminary injunction (DE 26)

"Plf. Opp." = Plaintiffs' brief opposing conversion to summary judgment (DE 33);

"Def. Brf." = Defendants' brief on conversion to summary judgment (DE 35);

"Resolution" = City of Plainfield, Zoning Board of Adjustment, Resolution of Findings and Conclusions, dated August 1, 2018 (DE 8-9);

1T = October 4, 2017 Transcript of Hearing (DE 23-1);

2T = November 1, 2017 Transcript of Hearing (DE 23-2);

3T = December 6, 2017 Transcript of Hearing (DE 23-3);

4T = April 11, 2018 Transcript of Hearing (DE 23-4);

5T = May 2, 2018 Transcript of Hearing (DE 23-5);

6T = June 6, 2018 Transcript of Hearing (DE 23-6).

While it is possible to consider a preliminary injunction hearing to be tantamount to a hearing on summary judgment or even a trial on the merits, it is not always appropriate to equate them. *See, e.g.*, *Resorts Intern., Inc. v. Greate Bay Hotel and Casino, Inc.*, 830 F. Supp. 826, 829 (D.N.J. 1992) (declining to consolidate a preliminary injunction hearing with a trial on the merits "because of suspicions that more evidence on liability might be forthcoming"). In the memorandum accompanying my order to show cause (DE 32), I quoted an outline of the legal standard governing the conversion issue:

> Rule 65 of the Federal Rules of Civil Procedure "empowers district courts to grant preliminary injunctions." *Doe v. Banos,* 713 F. Supp. 2d 404, 410 (D.N.J.), *aff'd,* 416 F. App'x 185 (3d Cir. 2010). "Because the scope and procedural posture of a hearing for a preliminary injunction is significantly different from a trial on the merits ... 'it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.'" *Anderson v. Davila,* 125 F.3d 148, 157 (3d Cir. 1997) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L.Ed.2d 175 (1981)). In appropriate circumstances, however, Rule 65(a)(2) provides a district court with the discretion to "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing." Fed. R. Civ. P. 65(a)(2). A district court may also convert a decision on a preliminary injunction application into a final disposition on the merits by granting summary judgment as long as sufficient notice is provided pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Krebs v. Rutgers,* 797 F. Supp. 1246, 1253 (D.N.J. 1992); *Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.,* 898 F.2d 1393, 1397 n. 4 (9th Cir. 1990); *see also* Fed. R. Civ. P. 56(f).
>
> Under Rule 56, summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). . . . .
>
> The Third Circuit has held, in accordance with principles of due process, that a district court should give the parties notice of its intent prior to entering summary judgment *sua sponte. See Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 280 (3d Cir. 2010). Notice is sufficient, however, "when 'the targeted party had

reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.' " *Zimmerlink v. Zapotsky,* 539 Fed.Appx. 45, 49 (3d Cir. 2013) (quoting *Gibson v. Mayor & Council of City of Wilmington,* 355 F.3d 215, 223–24 (3d Cir. 2004) (finding no notice is required if there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue)). "Even if a court fails to comply with the requirements of Rule 56(f), however, any such error 'may be excused if the failure was a harmless error.' " *Zimmerlink,* 539 F. App'x at 49 (quoting *Rose v. Bartle,* 871 F.2d 331, 342 (3d Cir. 1989)).

*Nat'l Collegiate Athletic Ass'n v. Christie,* 61 F. Supp. 3d 488, 496–97 (D.N.J. 2014).[2]

### B. Review of Zoning Board decision

Regarding the proper scope of review of a zoning board decision, the Third Circuit has held that "courts hearing reasonable accommodations challenges should ordinarily limit their review to the administrative record." *Lapid-Laurel,* 284 F.3d at 451. Importantly, "[t]his rule permits local land use boards to have the initial opportunity to provide reasonable accommodations to facilitate housing for the handicapped; it also comports with the tradition in American law that land use decisions are quintessentially local in nature." *Id.* (citing *FERC v. Mississippi,* 456 U.S. 742, 768 n.30, 102 S. Ct. 2126 (1982) ("Regulation of land use is perhaps the quintessential state activity.")); *Vill. of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S. Ct. 1536 (1974) (Marshall, J., dissenting) (noting that zoning "may indeed be the most essential function performed by local government").

---

[2]    The procedural principles outlined in the quotation in text are not affected by the lengthy subsequent history of that case: *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey,* 799 F.3d 259 (3d Cir. 2015), *reh'g en banc granted, opinion vacated* (Oct. 14, 2015), *on reh'g en banc,* 832 F.3d 389 (3d Cir. 2016), *rev'd sub nom. Murphy v. Nat'l Collegiate Athletic Ass'n,* 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018), and *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey,* 832 F.3d 389 (3d Cir. 2016), and *rev'd sub nom. Murphy v. Nat'l Collegiate Athletic Ass'n,* 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018).

Limiting the federal court's review in this manner "compels plaintiffs to 'present all of the evidence they have that would justify why an accommodation is necessary . . . to the local land-use board.'" *Barnabei v. Chadds Ford Twp.*, 125 F. Supp. 3d 515, 519-20 (E.D. Pa. 2015) (quoting *Lapid-Laurel*, 284 F.3d at 451). Moreover, "if plaintiffs fail to do so, they will be prohibited from introducing evidence in support of their FHA claims in federal court." *Id.* This framework further ensures that municipalities are not held liable for refusing to grant an accommodation where "those municipalities 'never knew the accommodation[s] w[ere], in fact, necessary.'" *Id.* (citing *Keys Youth Services, Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001)).

Courts have granted summary judgment upon review of a zoning board's reasoning. *See Schiazza v. Zoning Hearing Bd., Fairview Tp., York County, Pennsylvania*, 168 F. Supp. 2d 361, 370 (M.D. Pa. 2001) (granting partial summary judgment as to whether the zoning board's decision was supported by "substantial evidence"). However, summary judgment may be inappropriate when the claim involves a quintessential issue of fact, such as discrimination in the granting of variances. *See id.* at 371 (denying partial summary judgment where there was "a genuine issue of material fact concerning whether Defendant unreasonably discriminated between functionally equivalent providers of wireless services" in violation of a Pennsylvania telecommunications statute). A Zoning Board's factual findings are entitled to substantial deference and are presumed to be valid. *Price v. Strategic Capital Partners, LLC*, 404 N.J. Super. 295, 302, 961 A.2d 743 (App. Div. 2008) (citing *Burbridge v. Mine Hill Twp.*, 117 N.J. 376, 385, 568 A.2d 527 (1990) (quotation and citation omitted).

**III. Analysis**

Familiarity with the Prior Opinion is assumed; I will not reproduce here its lengthy analysis of the legal issues and the evidence before the Board. My focus here is on the particular arguments for and against conversion of the preliminary ruling to an award of summary judgment for defendants.

## A. Conversion to Summary Judgment: Prerequisites

Neither party contends that it lacked sufficient time to present its case, whether in connection with the preliminary injunction or, more relevantly, in connection with this application to convert my prior order. Even when acting *sua sponte,* district courts are empowered to enter summary judgments, "so long as the losing party was on notice that she had to come forward with all of her evidence." *Anderson,* 621 F. 3d at 280 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 (1986)). The record was fully developed. Both parties were given notice that this Court was considering converting the Prior Opinion to a grant of summary judgment. By order to show cause, Plaintiffs were given 30 days to submit appropriate arguments, and defendants were given 21 days to respond.

Nor were the parties denied the opportunity to introduce all relevant evidence. As noted above, the relevant evidence is contained in the administrative record, which was provided to the Court in its entirety. *See* Section II.B, *supra.* Still, Plaintiffs have included a variety of additional exhibits with their brief in opposition to conversion. (DE 33-2)[3] I will state generally that

---

[3]    I survey the documents briefly here, and cite them as relevant in the substantive discussion, *infra.* Cited by exhibit number, they are as follows:

(1) A New Jersey appellate division case, *Philogene v. CPR Holdings,* 2009 WL 425469 (N.J. Super. A.D. Feb. 24, 2009); (2) the New Jersey Supreme Court's denial of certification in that case. (DE 33-2 at 1–15) This 2009 case upheld the Board's prior grant of a variance for the property's use and expansion as a nursing home. Also attached is (13) the Board's 2005 resolution approving the original nursing home variance request. (DE 33-2 at 174) None of this information is new; the Board was thoroughly aware of it and it was cited in the Prior Opinion. (*See* Pr. Op. 20.)

(3) The 2006 dismissal of an earlier ethics complaint made by Michelson against Plaintiffs' counsel. (DE 33-2 at 16. *See* p. 17 & n.8, *infra.*)

(4) Yates's original application to the Board, including a letter certifying the property's code compliance and various news clippings about Yates. (DE 33-2 at 19). This was of course before the Board and is the subject of these proceedings.

(5) & (6) A news release and "Assurance of Discontinuance" in relation to an investigation by the Washington State Attorney General regarding discrimination against veterans seeking to rent housing. (DE 33-2 at 58–77).

I accord them little significance. They either (a) were already presented to the Board; (b) provide no more than some refinement or embellishment of points already made; or (c) relate to projects elsewhere, and have at best marginal relevance here. They do not, like the evidence in *Schiazza, supra,* fill a "gap" that was left in the administrative record.[4] I nevertheless cite them in the discussion, *infra,* where relevant.

Nor do the parties rely on any discrepancy between the standard that applies to a preliminary injunction motion (e.g., likelihood of success on the

---

(7) A blank HUD inspection checklist for Section 8 housing units. (DE 33-2 at 78).

(8) & (9) a HUD news release concerning the opening of a mixed housing facility, including units for homeless veterans, in the District of Columbia, and a floor plan of a typical unit. (DE 33-2 at 87).

(10) A copy of the Board Resolution denying approval (DE 33-2 at 97), attaching the HPC Resolution re: use and density variances (DE 33-2 at 158). This of course is the subject of this case, and was thoroughly discussed.

(11) HPC's certificate of appropriateness for the Dudley house project (DE 33-2 at 169). This was before the Board and the Dudley House comparable was discussed in the Prior Opinion. (Pr. Op. 16–17, 56).

(12) The HPC's certificate of appropriateness for Yates House. (DE 33-2 at 171–73 *See* p. 23, *infra.*)

(14) A mock-up of a furnished room in Yates House; (15) a listing of the proposed square footage of various rooms in Yates House. (DE 33-2 at 213–19). This information was all before the Board, and indeed the documents bear the hearing exhibit stickers.

(16) A resolution from the Board of Adjustment of Highland Park, New Jersey. (DE 33-2 at 220). This was cited to the Board as a comparable and discussed in the Prior Opinion. (Pr. Op. 15–16; *see also* Pr. Op. 50.)

[4]    This case is therefore unlike *Schiazza,* in which summary judgment was found to be inappropriate on certain issues. In that case, a local zoning board's decision would have contravened federal law if it resulted in a "significant gap" in wireless service in the local area. 168 F. Supp. 2d at 366. A key issue, then, was whether a wireless service provider other than the plaintiff covered the area in question. *Id.* at 367. Because the plaintiff had presented no evidence on that point, the court denied summary judgment. *Id.* Here, by contrast, the issue is whether the Board made the correct decision based on the information it received at the Hearing. Although Plaintiffs have provided additional materials along with their briefing, there is no indication that they lacked a full opportunity to make a record, and no indication of a gap in the record like the one in *Schiazza.*

merits) and the one governing summary judgment under Rule 56(a) (the presence of a genuine dispute as to a material fact and entitlement to judgment as a matter of law). There is no argument, for example, that the issue, although similar, would simply come out differently under the latter standard.

Plaintiffs' arguments relate instead to this Court's legal reasoning and interpretation of the record. In a sense, plaintiff's submission is akin to a motion for reconsideration. What they are really arguing is that the substantive analysis in the prior preliminary injunction opinion was wrong—not that some feature of it makes it inappropriate for conversion to summary judgment. I nevertheless consider those arguments, and consider whether they create a material issue of fact that bars summary judgment. *See* Fed. R. Civ. P. 56(a).

### B. Plaintiffs' Arguments on the Merits

#### 1. Whether the Board improperly weighed certain witnesses' testimony

##### a. Witness Coe/Financial Feasibility

Plaintiffs first discuss witness Rhonda Coe, an expert on affordable housing. Yates called Coe to testify as to the financial feasibility of the project.[5] (Pr. Op. 12-13). Plaintiffs appear to argue that the Board did not give Coe's testimony enough weight. (Plf. Opp. 3-4). That, however, was a decision for the Board to make; the Court did not err in upholding it.

Coe sought to demonstrate that the variances in minimum room size requirements were required to render the project economically viable. (Pr. Op. at 12-13). Neither the Board nor the Prior Opinion criticized Coe's calculations as such. But an opinion is only as good as the factual assumptions on which it is based. Ms. Coe's calculations were based on nothing more than "pro forma" financial figures provided by Mr. Yates, for which the Board was not shown any backup. When asked whether he would provide such backup as to "how [he]

---

[5]     To establish the "necessity" of an accommodation in a zoning case, the plaintiff must show that the requested variance is required to make the proposed facility "financially viable or medically effective" (*See* Pr. Op. 37-39.)

developed the construction and operating cost and financing costs," Mr. Yates replied, "Perhaps not." (4T111:6-9).

Yates grouses that providing the backup would have been futile: "Had Mr. Yates come forward with his assumed or anticipated facts, it still would have left the door open for criticism or denial of such facts by the Board." (Plf. Opp. 4). Perhaps so – but if he had provided such facts, then the Board would have had the opportunity to analyze the numbers and potentially explain why they did or did not point to financial viability. Then the legitimacy or not of any such "criticism" could have been assessed by the Court.

The Board and the Court did assess what little evidence Yates did provide as the basis for Coe's opinion. As I held, the Board could legitimately have treated it as suspect:

> In fact, the only verified financial figure in Coe's *pro forma* workup—the purchase price of the property—was demonstrably inconsistent with public records. Coe's opinion, presumably based on input from Yates, inflated the purchase price from $100,000 to $300,000, thereby increasing costs in a manner that would exaggerate the need for a larger facility.

(Pr. Op. 49).

Yates now attempts to minimize the distinction between $100,000 and $300,000, noting "that $200,000 difference is only 11 percent of the $1.78 million shortfall." (Plf. Opp. 4). The "$1.78 million" is a reference to the discrepancy between the income generated by rent subsidies and the project's proposed development cost, which would have to be covered from other sources, such as perhaps grants. (See Pr. Op. 13.) But if Coe's testimony made so little difference, then it likewise makes little difference that the Board discounted it. At any rate, an 11% shortfall, particularly in the context of the other evidence, is far from immaterial to the issue of financial viability. More generally, Yates's lack of specificity here could legitimately have influenced the Board's overall view of the credibility of his plan.

10

The Board's factual findings are entitled to substantial deference. I see no reason to adjust my conclusion that "I see no error in the Board's having opted to give little or no weight to Coe's opinion." (Pr. Op. 50).

Plaintiffs next argue that the Board should have retained its own financial expert to opine on the project's financial feasibility, noting that it could have done so at the applicant's expense. (Plf. Opp. 4-5). However, Plaintiffs cite no authority suggesting that the Board was required to do so. The Plaintiffs had the burden to demonstrate that the variance was required to render the accommodation financially viable. The Board was certainly obligated to consider Plaintiffs' evidence, but if it found that evidence inadequate, it was not independently obligated to develop additional evidence on its own.

Accordingly, the Board was justified in its consideration and analysis of Ms. Coe's testimony and the financial viability of the project.

### b. NIMBY prejudice

Yates's next objection concerns what it calls "NIMBY." That term, an acronym for "not-in-my-backyard," refers to those who allegedly opposed the project because they did not want formerly homeless veterans in their neighborhood. Plaintiffs cite various pieces of testimony that, in their view, suggest prejudice against such veterans. (Plf. Opp. 5-11).

If Yates could truly demonstrate that the Board's decision was motivated by a discriminatory animus against a protected class, then it might have a claim. *See 901 Ernston Road, LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, 2018 WL 2176175, at *6 (D.N.J. May 11, 2018) (finding a likelihood of success on the merits where plaintiffs presented sufficient evidence of zoning board's discriminatory treatment towards a center for recovering addicts). In that case, "[t]he testimony presented at and commentary following [the hearings] . . . made abundantly clear that Defendant Board and the local residents were of the NIMBY school of thought . . . ." *Id.*

It is not enough, however, for the losing party to simply posit in retrospect that the decisionmaker must have been prejudiced. The record in

11

this case does not suggest anything like the kind of discriminatory animus present in *Ernston,* particularly on behalf of the Board members.

In their brief, Plaintiffs list multiple quotes that they say are indicative of a NIMBY mindset. Plaintiffs quote twelve exchanges from the record. (Plf. Opp. 5-8). Of these, only three actually involve members of the Zoning Board. I focus on them.

The first exchange is a question by Vice-Chair Ruiz to Mr. Flax, the CEO of Yates House. Plaintiffs cut off the quotation at approximately the eighth line, but I reproduce it here in full:

> VICE CHAIR RUIZ: You have mentioned that run a couple of these programs successfully, for introducing individuals from the veteran community into housing. So we've spoken – there was a lot of questions on the entry. What is the process for separation, especially if they're not meeting certain intents or goals, where they become destructive inside your community, because you want to also control some elements inside the housing, because you're all amongst each other? But what are the things to create an eviction process? What will constitute a need for eviction? And I know there's due process and everything else, but it has to have happened in the past. I mean, you know how to get people in, but how do you get them out?

(2T75:21-76:11). Vice-Chair Ruiz is not expressing prejudice against veterans or PTSD sufferers; rather, he is asking an operational question regarding the program's process for evicting or otherwise dealing with disruptive tenants, if necessary. Mentioning the potential of "becom[ing] destructive inside *your* community" (emphasis added) clearly refers to the coexistence of participants *within* the proposed treatment program, not their interactions with the neighbors. I add that, of course, asking a question about a subject does not equate to expressing a derogatory opinion.

The next quoted statement is drawn from the same conversation, on the same subject:

> VICE CHAIR RUIZ: So but what -- have you had to evict -- and not because – it may be criminal activity, but damage to the facility, disturbance, or domestic violence, because if you have individuals

> that are cohabitating, potentially there's domestic violence
> protection. So what do you have – do you evict people? Where do
> you put them?

(2T77:6-13). This, too, is merely a question about procedures dealing with
potential incidents, such as, *e.g.,* damage to the facility or domestic violence
between cohabiting residents. Vice-Chair Ruiz then asked whether evictions
had occurred in Yates's previous facilities. Yates responded that they had, but
had not involved veterans or criminal activity:

> VICE CHAIR RUIZ: So there is a – the next question, has [eviction]
> happened already in your other work?
> MR. FLAX: No. There's been evictions, but none of them were
> veterans, and none of them were for any criminal element or drug
> use.
> VICE CHAIR RUIZ: Just by not paying rent?
> MR. FLAX: Probably that, yeah.
> VICE CHAIR RUIZ: Which the government's paying?
> MR. FLAX: Yeah, some guys.

(2T78:9-78:21).

Any facility must have procedures in place for eviction of unruly
residents. Fairly read, these passages relate to that concern, and not to any
perception of Vice-Chair Ruiz that these veterans should not be permitted to
live in the neighborhood. Nor did these concerns, which appear to have been
answered adequately, play any significant part in the Board's decision.

In another alleged NIMBY exchange, Commissioner Jordan asks Yates's
psychological expert whether veterans might have issues living in a community
with non-veterans:

> COMMISSIONER JORDAN: Yeah, if the vets are in temporary
> housing, and they're discharged, if they become homeless, then
> they're stabilized once they're in the temporary housing; once they
> become homeless, are they going to digress[6] in their, you know,
> psychological capacity?
> MR. EVERS: I think the goal of this project -- and I'd have to defer
> to the project manager to -- after they're discharged, they qualify

---

[6]   *Sic*: regress?

13

for HUD-VASH. The HUD-VASH program helps them pay the rent, so they can be in stable housing.

CHAIRMAN BELIN: Let me see if she's finished.

COMMISSIONER JORDAN: All right. So then a second question is, if there's a trust issue with the vets trusting people that are not vets, what would be the -- would there be an issue with them living in a community where it's just regular neighbors?

(3T64:25-65:20).

Yates had called Mr. Evers as a witness to help establish that communal living was essential to accommodate veterans with PTSD. (*See* Pr. Op. 47-49.) It was Mr. Evers who raised the concern that veterans prefer to live in communities with other veterans and have difficulty trusting non-veterans:

MR. EVERS: . . . People who've come back with PTSD have trouble relating to others; trouble relating to society; trouble relating to their job. Part of our job is to work to help them get over that disturbance in relationship. Interesting part is that one of the major treatment modalities for veterans is group therapy, a group of other veterans that have similar problems, so we don't have that hurdle. They also believe that they can trust another veteran, I can trust another veteran more than I can trust somebody else.

(3T30:17-31:3).

Commissioner Jordan's question, then, merely explored a concern raised by Yates's witness, Mr. Evers, about PTSD sufferers' difficulty in relating to outsiders. Commissioner Jordan asked this expert to explain his professional opinion, and the expert did so. A review of the entire conversation between the two (3T64:25-66:14) evinces no evidence of animus.

Commissioner Jordan also expressed concern about the Project's substandard housing conditions. That was not raised as a NIMBY concern on behalf of the surrounding community, but rather on behalf of the facility's residents, who would be crammed into small units:

COMMISSIONER JORDAN: According to testimony, the reason for the undersized apartments was to increase the number, to make it affordable for the owner. Perhaps they should consider a different kind of housing, where they can charge enough to make that

14

happen. The math should have been taken into consideration prior to the purchase of the property. Although providing housing for veterans is a noble idea, there should be more consideration for them, other than merely putting a roof over their head.

(6T71:10-71:21).

The Board members were expected and obligated to ask pertinent questions of the applicant and its expert witnesses. Altogether, the record of the hearings does not make it "abundantly clear," as claimed, that the Board's decision to deny the variances was an expression of the NIMBY mindset.

Compare *Ernston*:

> At times, comments by Defendant Board members reflected potential animus towards recovering addicts and associations with criminal behavior, prompting Defendant Board's counsel, Lawrence Sachs, to caution members from making logical leaps regarding the danger of RCA's patients. (*Compare* Dec. 13th Tr. 54:19–21 ("What happens if Joe Smith walks out of the facility and just walks 200 feet down Ernston Road and then they're at the school."), *with* id. 54:22–24 ("Again, we're taking a big leap that someone who [is] in this facility is a criminal, which obviously they're not."), *and* id. 55:5–13.) When explaining their decision to deny the application, Defendant Board members' statements seemingly contradicted the testimony of Plaintiffs witnesses, and instead relied on fears of crime and danger associated with RCA in their backyards. As one Board member tellingly admitted, "I don't think I could look in [my neighbors'] eyes and say, you know what? I voted yes for this to come in, in this particular area, and I had no regard for your safety." (Jan. 24th Tr. 142:8–12.) While Defendant Board did not rely solely on zoning as the rationale for its decision, it is clear that the fact that the intended occupants of [RCA] were recovering addicts was a motivating factor in their decision.

*Ernston*, 2018 WL 2176175 at * 6 (internal quotation marks and citations omitted). Nothing resembling these comments by Board members appear in the

record of this case. It cannot be concluded that the project was rejected on the basis of prejudice against the likely residents of the facility.[7]

### c. Witness Michelson

Plaintiffs then turn to the Board's and this Court's discussion of the testimony of a particular witness, Mr. Michelson. Michelson, they say, was improperly treated as an expert and was also motivated by "hostility toward Plaintiffs' counsel." (Plf. Opp. 9–10).

Plaintiffs claim that in the Prior Opinion, "the Court has quoted Mr. Michelson as though he was an expert with respect to Master Plan and zoning issues." (*Id.* at 9). Not so. Plaintiffs cite page 14 and page 20, footnote 23 of the Prior Opinion. On page 14, Michelson is referenced as objecting in his capacity as the Chairman of Plainfield's Historic Preservation Commission ("HPC"). (Pr. Op. 14). The citation of Michelson's testimony on page 20, footnote 23, is a reference to that same presentation. (Pr. Op. 20 n.23). At that time, Michelson was presenting a report prepared on behalf of the HPC. While not an expert on zoning laws *per se*, Michelson was testifying on a matter within the scope of his knowledge and function as Chairman of the HPC. The Board was entitled to hear such testimony and there is no indication that they misunderstood the basis on which it was proffered.

Yates suggests an inconsistency: Despite an expressed "refusal" to consider Michelson an expert, the Board and Court nevertheless treated him as such. (Plf. Opp. 9). But there is no inconsistency; this "refusal" is torn from the context of a later hearing. I reproduce what Plaintiffs have quoted, from the later hearing, here:

---

[7]     I must also note that the facility in *Ernston* was wholly dedicated to treatment of members of a protected class—recovering addicts—and the prejudicial comments were directed at such persons. *Id.* at *1, *5, *6. As discussed in the Prior Opinion, Yates never committed to housing veterans with PTSD, but merely predicted that such veterans would be among the residents. (Pr. Op. 47 ("Although Yates's rhetoric tended to suggest it, the proposed facility is not one for PTSD sufferers as such.")).

MR. MICHELSON: William Michelson, M-I-C-H-E-L-S-O-N, 556
Belvidere Avenue. I'm a resident, but I'm also obviously chairman
of the Historic Preservation Commission.

CHAIRMAN BELIN: But you're here speaking as a citizen. Correct?
Not as the chairman of the HPC.

MR. MICHELSON: Correct, I already delivered my report.

CHAIRMAN BELIN: So you're here as a citizen? I want to make that
clear.

MR. MICHELSON: There are comments where I'm going to be
expanding on that.

CHAIRMAN BELIN: But you're going to be here as a citizen.
Correct? I want to be clear.

MR. MICHELSON: Well, I'm a citizen, and I've also been involved in
this case for close to 20 years.

CHAIRMAN BELIN: But you're not here as the chairman of the
HPC. I need to be clear on that.

MR. MICHELSON: If that's the chair's wish, then that's what I will
go along with.

CHAIRMAN BELIN: That's not -- that has to be the case.

MR. MICHELSON: Sure.

CHAIRMAN BELIN: Thank you.

(6T24:8-25:11). So Michelson testified at one hearing as Chairman of the HPC,

and at a later hearing as a private citizen. The chairman of the Board

repeatedly clarified that distinction, and stated that Michelson's testimony at

the second hearing "ha[d] to" be considered as that of a private citizen. There is

no indication that this distinction was misunderstood, or that the second

hearing somehow retroactively tainted the first.

Whether, as Plaintiffs claim, Michelson is hostile to Plaintiffs' counsel is

of little consequence.[8] There is no indication that any such feelings harbored

by this witness affected the Board's decision.

---

[8]    The additional documents attached to Plaintiffs' papers include a dismissed
ethics complaint brought by Michelson against counsel. (DE 33-2 at 17). Nothing
about its subject matter is stated, but it dates from long ago, in 2006.

#### d. Veteran Witnesses

Finally, Plaintiffs argue that the Court (or the Board) was not sufficiently impressed by the testimony of veteran witnesses.

Specifically, counsel draws attention to the testimony of Mr. Emerson Crooks who, Plaintiffs claim, "gave impressive testimony supporting Dr. Evers' opinion that communal living for veterans requiring clinical services was essential." (Plf. Opp. 11). It may be the case that communal housing is beneficial to veterans, a proposition that was not really disputed. (1T56:12-60:9). That proposition is a poor fit, however, for the contention that the particular variances requested would be necessary to accommodate veterans with PTSD. This issue was discussed in the Prior Opinion. (*See* Pr. Op. 48 ("[T]here was no testimony attesting specifically that 25 units, or the anticipated 36 residents therein, were needed to achieve [the] therapeutic benefit.")).

None of the arguments raised by Plaintiffs regarding witnesses cast doubt on the conclusions of the Board or this Court. They also do not indicate that summary judgment is inappropriate.

### 2. Protected class

Plaintiffs argue that the Court erroneously declined to deem the proposed residents a protected class under the FHAA. They first take issue with the Court's assertion that Yates's desire to serve veterans in the property evolved over time. (Plf. Opp. 11-12). In support of this critique, Plaintiffs offer several pieces of circumstantial evidence indicating that the project was always intended to serve homeless veterans. (*Id.*). This evidence, however, does not suggest that the project was intended to *exclusively* serve homeless veterans or, more importantly, veterans with PTSD. A major flaw in Plaintiffs' argument is that the actual protected class—*i.e.,* the class of "handicapped" persons under the FHAA—is defined as those who suffer from PTSD, not merely veterans or even homeless veterans. (*See* Pr. Op. 47 ("If plaintiffs wished to take advantage of the special protections afforded individuals with PTSD, they could have

proposed a facility that limited admission to such persons. They did not do so.")).

Plaintiffs draw a distinction between the willingness of the operator of the property to deed-restrict the facility and the reticence of the owner to do so. (*See* Plf. Opp. 13 ("It shouldn't be surprising that a property owner, not being the party serving the veterans, might be somewhat reluctant to agree to a deed-restriction.")). There was no distinction drawn between the operator and the property owner, who in fact was seeking the variance. Plaintiffs further state that ultimately the property owner did agree to a deed restriction. (*Id.*). But this alleged agreement to deed-restrict applied at best to veterans generally, not veterans with PTSD. (4T106:25-107:6).

Plaintiffs then make a partially contradictory argument that "a majority of homeless veterans suffer from some degree of a mental condition known as PTSD," and that the public unfairly stigmatizes veterans as PTSD victims. (Plf. Opp. 13). These public fears, they argue, "are compelling proof that veterans are <u>regarded</u> as having some form of mental disorder, whether homeless or not." (Plf. Opp. 14). Plaintiffs miss the point here. Their own failure to establish the prevalence of PTSD among veterans, and especially the veterans who would be living in the facility, weakened their presentation. The Court said no more than that. (*See* Pr. Op. 47 ("Yates never demonstrated what percentage of the residents would be PTSD sufferers; nor, conversely, did it state what percentage would be mere tag-alongs (with respect to the FHAA claims, that is). At best, Yates established that there likely would be a significant percentage of PTSD sufferers among the homeless veteran population.")).

I see no reason to adjust my conclusion in the Prior Opinion that the proposed residents are not, *per se,* a protected class under the FHAA. That circumstance did not doom, but weakened the application. (Pr. Op. 46–49).

### 3. HUD-VASH requirements

Plaintiffs next claim that the Board improperly concluded that the proposed unit size variance would run afoul of requirements of the U.S. Department of Housing and Urban Development-VA Supportive Housing

("HUD-VASH") Program. They cite no such conclusion by the Board, and there is no indication that this was a prominent factor in the Board's analysis.

What Yates is talking about is its own insistence that the proposed unit sizes *did* comply with HUD-VASH requirements. (Plf. Opp. 14-17). Yates's presentation on this issue was equivocal, in that it relied on statements of Mr. Yates or his counsel, rather than evidence. Still, the Court, far from "rejecting" it, supplemented it with its own citations to HUD regulations. (*See* Pr. Op. 9–10 & n.8.)

The Prior Opinion does observe that one Board member "expressed doubt that veterans who were recipients of HUD-VASH vouchers would choose to reside in 'substandard units.'" (Plf. Opp. 17 (citing Pr. Op. 24 n. 25)). This was not a statement (whether erroneous or correct) that the units did not comply with HUD-VASH standards. The Board member's point was that the Project's viability depended in part on veterans with HUD-VASH vouchers, but that such veterans might well opt to use their vouchers elsewhere, as there were plenty of larger, affordable units elsewhere in town. (Pr. Op. 24 n.25).

Compliance with HUD-VASH minimum size standards was not the issue before the Board. It is incontestable that most of the unit sizes were far below *Plainfield*'s zoning minimums. Plaintiffs still fail to explain how HUD-VASH standards, whatever they are and whether or not they were met, impacted the correctness of that conclusion.

### 4. Particular variance requests

Plaintiffs claim that the Court "supports the Board's decision in substantial part based upon the large number of variances requested by Plaintiffs." (Plf. Opp. 17). The Court did state the number of variances sought (Pr. Op. 1, 4), and stated that "[t]he Board concluded that the number of variances required could not be granted without creating a substantial detriment to the City's zoning plan . . . ." (Pr. Op. 26). That is an accurate statement of fact. Neither this Court nor the Board, however, relied on the sheer number of requested variances, as opposed to the *substance* of those

20

variance requests. The associated suggestion that the variances should be counted differently, producing a lower total, is not relevant.

Plaintiffs then take issue with the rejection of specific variance requests. The first is the refusal to allow nine or eleven parking spaces, rather than the forty-five required by the zoning laws. (Plf. Opp. 18; Pr. Op. 4). Plaintiffs argue that residents probably would not own cars and that Yates had offered to provide transportation or off-site parking. (Plf. Opp. 19). The Board could rightly have regarded this as too speculative a basis for approving a facility with a mere fraction of the required spaces.

This argument, moreover, does not address the Board's concerns that guests of residents would need to park, and that the streets around the facility lacked the capacity for more cars. (*See* Pr. Op. 11-12.) Finally, the Plaintiffs' reference to a parking variance granted to a similar facility in Highland Park, New Jersey, is inapposite. Highland Park, a distinct community located some 12 miles away from Plainfield, has "low" demand for on-street parking, and parking is "readily available" there. (Pr. Op. 16 (citations omitted)).

Plaintiffs then turn to a "350 cubic foot storage space issue" which they claim was improperly designated a variance when it was in fact a "design waiver." (Plf. Opp. 19). Plaintiffs are correct that the Board and I grouped this design waiver with the variance requests. Still, even accepting Plaintiffs' unsupported assertion in their brief that this design waiver is "always" granted (*id.*), this specific issue is immaterial. The Board's conclusions regarding variance requests did not refer to it. (*See* Resolution at 45-55.)

### 5. "Miscellaneous facts"

Plaintiffs call attention to what they consider to be several mistaken conclusions of fact by the Board. Specifically, they point to an allegation that the project would violate "historic preservation provisions" and a statement that Yates had not maintained the property. (Plf. Opp. 20-21).

Plaintiffs question a statement in the introduction to the Prior Opinion that the Board cited violation of historic-preservation standards in its Resolution. (Pr. Op. 2). Yates points out that it was in fact granted a certificate

of appropriateness from the HPC which certified the project's compliance with specific historical-preservation codes.[9] The introductory statement by the Court, however, was not referring to the HPC certificate; rather it accurately reported the Board's conclusion that the requested variances were "inimical to the purpose, objectives, and policies of the Historic Preservation Element of the City's Master Plan." (Pr. Op. 55). I did not mistake the matter, and neither did the Board; the Resolution clearly and correctly stated that the property had been issued a certificate of compliance by the HPC. (*See* Resolution at 26-27.)

Plaintiffs object to the statement that the property had not been improved lately. The property, they point out, was in compliance with the City of Plainfield's code. (Plf. Opp. 21). Apples and oranges; what the Court wrote was the correct statement that "Yates had not taken any steps to improve the property from the time it had acquired the property in 2012 until the time of the application before the Zoning Board, a period of about five years." (Pr. Op. 18 n. 18).

Ultimately, however, these facts are immaterial—they were not extensively discussed by the Board, nor can Yates establish that they factored prominently in the Board's decision.

## 6. Whether the Court drew correct legal conclusions

In addition to the factual critiques cited above, Yates makes some legal arguments.

Plaintiffs first argue that the proposed residents of the project are a protected class. They argue that PTSD is a protected characteristic and that the Board members expressed fear of veterans, such that "it seems clear that they regard such veterans as having a mental condition." (Plf. Opp. 22). There is no doubt that PTSD is a protected "handicap" under the FHAA. The issue, as discussed above, is that Plaintiffs failed to establish any very tight connection between the class of PTSD sufferers and the potential residents of the project,

---

9     A copy is attached to Yates's papers. (DE 33-2 at 171–73; *see* pp. 7–8 n.3, *supra*.)

and in fact refused to confine residency to PTSD sufferers, or any particular percentage of PTSD sufferers. *See* Section III.B.2, *supra*. Nor did they justify the necessity of the variances to serve these potential residents.

Plaintiffs then argue that the variances were in fact necessary for therapeutic and financial reasons. The Prior Opinion discussed this issue. (*See* Pr. Op. 48-49 (agreeing "with the Board that the plaintiffs did not demonstrate that the particular size of the proposed facility was necessary or essential to its therapeutic benefit.")). Plaintiffs raise no new arguments here in support of their position that the variances were necessary to accommodate the protected class.

For its argument that the variances were necessary to render the project financially viable, Plaintiffs again point to the testimony of Rhonda Coe. The Board's justified conclusion that Coe's testimony did not support a finding of financial necessity for the variances is discussed above. *See* Section III.B.1.a, *supra*.

Plaintiffs object to any statement that "there were numerous other zones where the Plaintiffs might have provided veteran housing," arguing as a matter of law that homeless veterans have every right to reside in the historic district. (Plf. Opp. 23-24). The quoted statement refers to a paragraph in the Prior Opinion summarizing the Board's Resolution. (Pr. Op. 23). The Prior Opinion discussed at length the law and the significance of the availability of alternative living facilities. (*See id.* at 43-46.) I fully accepted that the reasonableness of the accommodation must be considered "in light of [an] overall concern that zoning restrictions not restrict handicapped persons' ability to obtain mainstream housing in residential neighborhoods." *Id.* at 46. This issue was neither overlooked nor erroneously decided.

Plaintiffs then point to the HPC's failure to oppose variances for Dudley House, a site in a nearby historic district. (Plf. Opp. 23-24; *see* Ex. 11, DE 33-2 at 169.) But, as discussed in the Prior Opinion, this facility was in a different district with different conditions. Moreover, Dudley House was a transitional

rooming facility, not permanent housing, for the formerly homeless.[10] (Pr. Op. 16–17, 56).

Finally, Plaintiffs explain that the requested variances are reasonable since the Board had previously granted variances to the previous owner of the subject property. These variances permitted a nursing home, authorized in 2005, to expand in 2009 from thirty-five to sixty beds. (Plf. Opp. 24; attached are the 2005 approval and an Appellate Division case upholding the Board's 2009 grant of the variance. (*See* pp. 7–8 & n.3, *supra.*)) I am not convinced that the variances at issue here are "nearly identical" to the nursing home variance, as Plaintiffs claim. (Plf. Opp. 24). Moreover, the burden for establishing the need for a variance falls to the applicant. (*See* Pr. Op. 20, 32–33.) The record is replete with the Board's careful consideration of the various factors relating to this variance request. Plaintiffs needed to make their case on its own merits, and the Board reasonably concluded that they had not done so.

### 7. Whether the Board's decision violated the MLUL

Though not addressed by Plaintiffs in their motion for a preliminary injunction, Plaintiffs' Complaint alleged in Count Four that the actions of the board were arbitrary, capricious, and unreasonable in violation of the MLUL. (DE 1). I am prepared to grant summary judgment on this issue as well.

The MLUL, N.J. Stat. Ann. §§ 40:55D-1 to -136, is a comprehensive statute that allows municipalities to adopt ordinances to regulate land development "in a manner which will promote the public health, safety, morals and general welfare" using uniform and efficient procedures. *Levin v. Twp. of Parsippany-Troy Hills*, 82 N.J. 174, 178-79 (1980). Under the MLUL, the decision of a board of adjustment is presumptively valid, and may be reversed only if it is unsupported by the record, arbitrary, capricious, or unreasonable, to the point that it amounts to an abuse of discretion. *Kratz v. Zoning Bd. of*

---

[10] Plaintiffs also claim, perhaps to support a literal NIMBY implication, that Michelson "[o]f course" lives in the Van Wyck Brooks Historic District. (Plf. Opp. 24 n. 21). The home address given by Michelson in his testimony is not within the district. (Def. Brf. at 9; Testimony quoted at p. 17, *supra.*)

*Adjustment of City of Hoboken*, 2007 N.J. Super. Unpub. LEXIS 1110, at *15 (App. Div. July 25, 2007) (citation omitted); *see Rowatti v. Gonchar*, 101 N.J. 46, 51–52 (1985) (recognizing that arbitrary and capricious standard of review parallels substantial evidence standard when applied to zoning board's decision.).

As mentioned above, a Zoning Board's factual findings are entitled to substantial deference and are presumed to be valid. *Price v. Strategic Capital Partners, LLC*, 404 N.J. Super. 295, 302 (App. Div. 2008) (citing *Burbridge v. Mine Hill Twp.*, 117 N.J. 376, 385 (1990) (quotation and citation omitted); *Kramer v. Bd. of Adjustment, Sea Girt*, 45 N.J. 268, 296 (1965)). "The test is essentially one of rational basis." *Worthington v. Fauver*, 88 N.J. 183, 204–05 (1982). "Arbitrary and capricious action . . . means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is (valid) when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." *Id.* (internal quotations and citation omitted).

The bar is purposely set very high for the Plaintiffs to succeed in claiming that the Board's careful and measured consideration was arbitrary and capricious. A review of the record indicates no such thing. The Board held six days of hearings and, although the Board did not ultimately accept Yates's view, it clearly gave Plaintiffs the opportunity to make their case. The Resolution outlines specific articulable reasons why the Board denied Plaintiffs' application. Additionally, the above analysis with respect to the Plaintiffs' arguments against the Board's decision (Sections III.B.1-5, *supra*) applies equally to this claim. Therefore, I conclude that summary judgment in favor of Defendants as to this Count is appropriate.

## IV.    Conclusion

Plaintiffs have been given sufficient opportunity to introduce all evidence, and sufficient notice of the Court's intention to convert the opinion denying a preliminary injunction to a grant of summary judgment in Defendants' favor. I have considered whether the facts, even as supplemented, suffice to create a factual or legal issue that would bar summary judgment. Plaintiffs have largely focused their efforts on a renewed attempt to demonstrate that the Board's reasoning was wrong, or that the factual or legal analysis contained in the Prior Opinion was incorrect. I find that those efforts have failed to yield a genuine, material issue of fact that stands in the way of judgment for defendants as a matter of law.

Therefore, for the reasons expressed above, the Court's Opinion denying the preliminary injunction (DE 26) is **CONVERTED** into an Opinion granting summary judgment in favor of the Defendants. Summary judgment is **GRANTED** in favor of the Defendants as to all Counts.

An appropriate order follows.

Dated: January 23, 2020

**Kevin McNulty**
**United States District Judge**